775 A.2d 535 (2001)
341 N.J. Super. 381
Harry WILDE and Joan Wilde, Plaintiffs-Respondents,
v.
Tracy WILDE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 23, 2001.
Decided June 22, 2001.
*538 Alan L. Zegas, Chatham, argued the cause for appellant (Mr. Zegas and Associates, attorneys; Sharon Bittner Kean and Mr. Zegas, on the brief).
Neil S. Braun, argued the cause for respondents (Donahue, Braun, Hagan, Klein & Newsome, attorneys, Short Hills; Mr. Braun and Gerri Gomperts, Springfield, of counsel; Eric S. Solotoff, Chatham, on the brief).
Ann Marie Seaton, Senior Deputy Attorney General, argued the cause for amicus curiae State of New Jersey (John J. Farmer, Jr., Attorney General, attorney; Nancy Kaplen, Assistant Attorney General, of counsel; Ms. Seaton, on the brief).
American Civil Liberties Union of New Jersey Foundation, filed an amicus curiae brief (Ronald K. Chen, Newark, on the brief).
AARP, filed an amicus curiae brief (Poplar & Eastlack, attorneys; John Eastlack, Turnersville and Rochelle Bobroff, on the brief).
Before Judges KING, COBURN and AXELRAD. *536
*537 The opinion of the court was delivered by COBURN, J.A.D.
Plaintiffs, Harry and Joan Wilde, sued defendant, Tracy Wilde, whose fitness as a mother is unquestioned, seeking visitation with her children under the Grandparent Visitation Statute, N.J.S.A. 9:2-7.1 ("the GVS"). The children have four grandparents. Harry is their paternal grandfather and Joan, his second wife, is their step-grandmother. Tracy appeals from an order denying her motion to dismiss the complaint on the ground that the statute is unconstitutional on its face and as applied. Although the facial attack has substance, we reverse because the GVS is unconstitutional as applied.
The parties recognize that the procedural posture of this case is somewhat irregular with respect to the "as applied" issue. Ordinarily, the anomaly would require a remand for further proceedings in the trial court; however, both sides urge us to conclude the litigation with finality, and we believe that course serves the interests of justice. To place our decision in perspective, we will first discuss the significant proceedings leading to this appeal.
After the initial pleadings had been filed, plaintiffs filed their first motion demanding immediate visitation with Tracy's children pendente lite. On April 24, 2000, faced with conflicting certifications reflecting intense animosity between the parties, the trial court entered an order that temporarily denied visitation and, instead, appointed a psychologist as a "therapeutic evaluator." He was charged with the responsibility of interviewing and testing the parties and the children and making recommendations to the trial court respecting therapeutic mediation and visitation. Tracy was ordered to pay half of his bill. Both sides were permitted to retain their own experts, with each being obliged to cooperate with the other's expert. All discovery was to be completed by June 5, and a "plenary" hearing was set for June 27. Although the April 24 order seemed to be setting the date for trial, that is not what occurred.
In late May, Tracy filed a motion seeking dismissal of the complaint on constitutional grounds. On June 28, the court-appointed psychologist, Dr. Edwin Rosenberg, testified. On July 14, the trial court *539 entered an order requiring Tracy to "seek intensive therapy in addition to the supportive therapy which she is currently receiving from her treating therapist...." Five specific dates were scheduled for the therapy, which would "specifically focus on the displacement issues described by Dr. Rosenberg in his testimony...." The order appointed Dr. Judith Brown Grief as "therapeutic mediator," with the costs of her services "to be shared equally between the plaintiffs and the defendant." Visitation pendente lite was again denied. Finally, the order set a date in September for "further argument on defendant's motion challenging the constitutionality of N.J.S.A. 9:3-7, both on its face and as applied." By this time the Attorney General was involved in the case because of the facial attack on the GVS, and Tracy had moved unsuccessfully for the judge's recusal.
On July 28, plaintiffs moved for the third time for visitation pendente lite. The trial court again denied the motion and ordered the parties to "begin the process of therapeutic mediation with Dr. Grief." Before argument on the constitutional issues, joint mediation sessions were only to occur with the consent of all parties. However, Tracy was ordered to continue receiving therapy from her psychologist.
Tracy sought leave to appeal from those portions of the orders of July 14 and July 28 requiring intensive therapy and therapeutic mediation. On September 28, we granted leave to appeal. R. 2:5-6. Since the dates set for defendant's intensive therapy had passed, we only ruled on that portion of the order requiring her to submit to therapeutic mediation with Dr. Grief. We summarily reversed that aspect of the orders because we believed Tracy was entitled to resolution of the constitutional questions before having to submit to psychological mediation. We remanded "for disposition of defendant's claim that N.J.S.A. 9:2-7.1 is unconstitutional." We added, "This court will retain jurisdiction to review the trial court's decision on constitutionality and upon disposition of that issue on appeal, this court will then reconsider the trial court's decision as to the requirement that the defendant engage in therapeutic mediation, and such other issues as may arise."
On October 10, the trial court entertained oral argument on the constitutionality of the GVS, both facially and as applied, and rendered an oral opinion, which was subsequently placed in written form. Although the trial court was still confronted with certifications from the parties that conflicted in many important regards, neither side requested a plenary hearing before or after the trial court's decision.
After holding the GVS facially constitutional, the trial court turned to the question of the statute as applied. With respect to that issue, the trial court appears to have perceived defendant as arguing that she should not be forced to spend money defending her position and she should not be required to submit to individual psychological therapy or therapeutic mediation with plaintiffs. The trial court rejected the first claim because the Legislature had provided for suits of this nature and deferred ruling on the second claim apparently because we had indicated in our remand order that we would address it subsequently. Then, without resolving the disputed facts, the trial court proceeded to hold that the GVS was constitutional as applied.
As should be evident, the trial court's opinion is anomalous. Generally, the "as applied" constitutional validity of a statute cannot be determined without first establishing relevant facts. Nevertheless, the opinion purports to do precisely that. Rather than speculate about the *540 reasons that might have led the trial court to its resolution of the case, and rather than remand for a plenary trial on the constitutionality of the GVS as applied, we will exercise the original jurisdiction necessary to definitively conclude these proceedings. R. 2:10-5.
We follow that course for three reasons. The first was articulated by Justice Kennedy and approved by the plurality in Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), the Supreme Court's initial consideration of the constitutionality of nonparental visitation statutes. He wrote this:
It must be recognized, of course, that a domestic relations proceeding in and of itself can constitute state intervention that is so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated.... If a single parent who is struggling to raise a child is faced with visitation demands from a third party, the attorney's fees alone might destroy her hopes and plans for the child's future.
[530 U.S. at 101, 120 S.Ct. at 2079, 147 L.Ed.2d at 78 (Kennedy, J., dissenting); approved by the plurality, 530 U.S. at 73, 120 S.Ct. at 2064, 147 L.Ed.2d at 61.]
Second, although the certifications conflict in many regards, the undisputed facts, coupled with Dr. Rosenberg's uncontested opinions, provide a sufficient basis for resolution of the case in Tracy's favor under a summary judgment model. R. 4:46. And third, plaintiffs have specifically asked in "light of the delay" (they have not seen the children for over seventeen months) that we "exercise original jurisdiction."

I
Tracy and Russell Wilde were married in 1992 and had two children, Russell, Jr., now eight, and Hayden, now six. On September 18, 1999, Russell, Sr., a Cranford Police Department Lieutenant, committed suicide with a handgun at home and in Tracy's presence. Harry Wilde, the Chief of Police in Cranford, is Russell Sr.'s father and the children's grandfather. He is divorced from their grandmother and is married to Joan, the children's step-grandmother.
The relations between plaintiffs and defendant had been strained for many years; nonetheless, Tracy's children had visited with Harry and Joan on numerous occasions though not regularly. Plaintiffs were permitted to visit briefly with the children on the day of the funeral and for a longer time the next day at Tracy's parents' home. Although Harry certified that after his son's burial on September 22, "defendant became very distant towards the plaintiffs and made it difficult for them to have any grandparenting time with their grandchildren," he did not specify any actions plaintiffs took to secure such time until December 21.
In the meantime, on four occasions in November, Harry went to the children's school, visiting there with Russell, Jr. three times and with Hayden once, all without asking Tracy's approval. On November 29, when Tracy came to the police station to complain about these visits, Harry rejected her complaint as unwarranted since the school had permitted them. He described the conversation as "illustrative of the several conversations which plaintiffs had with defendant after the death of their son in which defendant expressed her hostility toward plaintiffs." About a month later, on December 21, Joan called Tracy, leaving a message that they wanted "to schedule some time to spend with the grandchildren during the day on Christmas Eve." She left the same message on *541 December 22, and the next day Tracy returned the calls and agreed that plaintiffs could see the children on Sunday, December 26, which they did, spending about two hours playing with the children. On December 29, Tracy returned the Christmas gift she had received from plaintiffs with a note that read, "Due to the circumstances, I really cannot accept this. Tracy."
On January 13, 2000, plaintiffs called Tracy and asked "if they could pick up the children on January 17, 2000 (a school holiday) to celebrate Hayden's birthday and take them to breakfast" and purchase some toys. Harry certified that "[t]here was a very long pause from defendant, after which time she told plaintiff that she had to work and that she would check her schedule. Plaintiffs have not heard from defendant since."
On January 21, plaintiffs had their attorney write this letter to Tracy:
Please be advised that this firm has been retained by Harry and Joan Wilde to pursue their rights as grandparents with regard to Russell and Hayden Wilde.
The Wildes have expressed a desire to have grandparenting time with their grandsons, a right which is recognized in New Jersey by both statute and case law. I would ask that you choose among the following three Sundays and advise me immediately on which Sunday it will be convenient for you to have the boys visit with their grandparents: January 30th, February 6th or February 13th. The Wildes would pick up the boys at 12 noon and would return them at 6:00 p.m.
I would appreciate your prompt response in order to avoid the necessity for an application to the Court. As noted above, it is entirely appropriate for the Wildes to have frequent grandparenting time with their grandsons. However, if you wish to have an attorney contact me, I ask that you do so immediately. In the interim, I would like to arrange for this initial Sunday visit. After this has been arranged, I am happy to speak either directly with you or with any representative on your behalf with regard to setting up a schedule for future grandparenting time.
As you no doubt know, the Wildes are a wonderful resource for your children. Grandparents lend enormous emotional support to their grandchildren, as well as offering them a variety of experiences that parents often cannot. Particularly now, under these most stressful times, it would seem to me that the boys can benefit from all the love and support that they can receive from family. I cannot imagine that you wish to withhold this source of comfort from them.
I look forward to hearing from you and ask that you reply promptly. If I do not hear from you or a representative on your behalf within seven days, I will have no choice but to file an application with the Court. I hope that such action will not be necessary.
On January 28, Tracy's attorney rejected the demand, explaining that Tracy believed visitation was inappropriate "at this time." Suit was filed on February 9, less than five months after the suicide. It was also less than a month after Tracy had failed to agree for the first time to visitation on a particular day.
Harry's certifications include the following statements about Tracy:
[Her] certification contains nothing but fabrications, lies and misrepresentations [and reveal] a desperate attempt to gain control of a situation over which she had no control.
....
[She] neglects to tell the Court that the reason Russell was forced to work as *542 hard as he did was because of defendant's frivolous spending, and the large credit card debt which she incurred.
....
[She] should be sanctioned for her perjurous [sic] statements.
....
We are seriously concerned about defendant's state of mind and ability to deal with situations in a rational manner in light of the contrived, vicious, and vindictive personal attacks on us. Defendant's certification is filled with outright lies. Defendant is attempting, out of desperation or greed, to defame our character and in her effort to do so, she is destroying our grandchildren and our relationship with them.
The court-appointed psychologist, Dr. Rosenberg, testified that participation in therapeutic mediation with plaintiffs would be very difficult for Tracy. He also believed that without her participation in such mediation, visitation by plaintiffs, which he believed would ultimately be in the children's best interest, would "exacerbate Tracy Wilde's anger and sense of betrayal," and would "significantly impact on the children in a negative way."

II
A. The Grandparent Visitation Statute
In its present form, the GVS provides as follows:
a. A grandparent or any sibling of a child residing in this State may make application before the Superior Court, in accordance with the Rules of Court, for an order for visitation. It shall be the burden of the applicant to prove by a preponderance of the evidence that the granting of visitation is in the best interests of the child.
b. In making a determination on an application filed pursuant to this section, the court shall consider the following factors:
(1) The relationship between the child and the applicant;
(2) The relationship between each of the child's parents or the person with whom the child is residing and the applicant;
(3) The time which has elapsed since the child last had contact with the applicant;
(4) The effect that such visitation will have on the relationship between the child and the child's parents or the person with whom the child is residing;
(5) If the parents are divorced or separated, the time sharing arrangement which exists between the parents with regard to the child;
(6) The good faith of the applicant in filing the application;
(7) Any history of physical, emotional or sexual abuse or neglect by the applicant; and
(8) Any other factor relevant to the best interests of the child.
c. With regard to any application made pursuant to this section, it shall be prima facie evidence that visitation is in the child's best interest if the applicant had, in the past, been a full-time caretaker for the child.

[N.J.S.A. 9:2-7.1]
To a limited degree and for the first time, the State Supreme Court considered the meaning of the statute in In re Adoption of Child by W.P., 163 N.J. 158, 748 A.2d 515 (2000), which held that the GVS must yield to the Adoption Act. Commenting on the importance and reason for the listing of factors, the Court said this:
In its original form, the bill did not enumerate factors, requiring only that visitation be in the best interests of the child, with no guidance to the courts. In an apparent response to concerns that it *543 constituted "a gross invasion of the sanctity and privacy of the family unit," the bill was amended, setting forth the eight factors as a way of limiting the intrusive elements of the act.

[Id. at 166, 748 A.2d 515 (citation omitted).]
The Court also inferred from the legislative history that "the Legislature believed that parental autonomy should be afforded deference." Ibid. Finally, the Court indicated that grandparents were limited to "blood relatives." Ibid.
In a dissenting opinion joined by Justice Stein, Chief Justice Poritz expanded on the Court's discussion of the meaning of the GVS. She said that the "best interests benchmark is ... circumscribed by the multiple-factor test, which guides but does not limit judicial discretion...." Id. at 198, 748 A.2d 515. The statute "mandates that courts give deference to parents' objections to visitation and to their beliefs concerning the best interests of their child." Id. at 198-99, 748 A.2d 515. She also observed, "Only in those cases where the grandparents have had a relationship with the child, can they even make a threshold showing that they come under the visitation statute." Id. at 186, 748 A.2d 515. She added that "grandparent visitation cannot threaten the stability of the parent-child relationship in any way." Id. at 198, 748 A.2d 515.
A literal reading of the statute might not appear to readily support the inferences drawn by the Court and the Chief Justice, but as Judge Learned Hand observed, "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." Cabell v. Markham, 148 F.2d 737, 739 (2nd Cir.), aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945). With varying turns of expression, the courts of this State have consistently expressed the same philosophy. See, e.g., Leitner v. Citizens Cas. Co., 135 N.J.L. 608, 611-12, 52 A.2d 687 (E. & A.1947); Dvorkin v. Dover Tp., 29 N.J. 303, 313, 148 A.2d 793 (1959); Valerius v. City of Newark, 84 N.J. 591, 598, 423 A.2d 988 (1980). Therefore, considering the GVS in light of the United State Supreme Court's decision in Troxel, delivered after W.P. was decided, and our obligation to construe a statute to avoid constitutional defects if it may reasonably be so interpreted, State v. Johnson, 166 N.J. 523, 540, 766 A.2d 1126 (2001), we are satisfied that the statute should be interpreted in the manner indicated by the Court and the Chief Justice.
B. The Facial Validity of the GVS
In Troxel, the United States Supreme Court was asked to hold the State of Washington's nonparental visitation statute unconstitutional on its face. The plurality opinion noted that the primary constitutional question was whether the Due Process Clause requires all such statutes "to include a showing of harm or potential harm to the child as a condition precedent to granting visitation." 530 U.S. at 73, 120 S.Ct. at 2064, 147 L.Ed.2d at 61. The plurality declined to resolve the facial challenge, agreeing with Justice Kennedy "that the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best `elaborated with care.'" Ibid. Facial invalidation "is, manifestly, strong medicine" that "has been employed by the Court sparingly and only as a last resort." Broadrick v. Oklahoma, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L. Ed.2d 830, 841 (1973).
*544 We do not mean to suggest that Tracy's request that we declare the statute facially invalid lacks substance. As we have observed, the United States Supreme Court emphasized the point that the litigation itself is a burden on the parent's substantive due process rights. One can easily imagine circumstances in which that burden would be grave indeed. For example, suppose that Tracy had determined that the best interests of her children required no further visitation with any of the grandparents. She might then have been faced with three separate lawsuits, one from her parents and one from the children's paternal grandmother, in addition to this action, with each of them seeking visitation, either in the same action or in sequential lawsuits. In WP, the Court recognized conflicts of this nature as one of the reasons for denying visitation to grandparents whose grandchild had been adopted by third parties. 163 N.J. at 175, 748 A.2d 515. Thus, a constitutional principle of law prohibiting such lawsuits so long as the parent is fit, meaning potential harm to the child is absent, would appear to have considerable merit.
We must, however, not lose sight of the general proposition that "whenever a challenge is raised to the constitutionality of a statute, there is a strong presumption that the statute is constitutional." State v. Muhammad, 145 N.J. 23, 41, 678 A.2d 164 (1996). Moreover, to succeed on a facial challenge, a party "must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697, 707 (1987). In light of those principles, the guidance provided by Troxel, and our ability to rule in Tracy's favor on an "as applied" basis, we decline the opportunity to resolve the facial validity of the GVS.
C. The Validity of the GVS As Applied.
The starting point for analysis of this issue must be the plurality opinion in Troxel, authored by Justice O'Connor and joined by the Chief Justice and Justices Ginsburg and Breyer. However, before describing the principles she expressed, we should consider the effect of the concurring opinion by Justice Thomas.
After noting that "neither party has argued that our substantive due process cases were wrongly decided," 530 U.S. at 80, 120 S.Ct. at 2067, 147 L.Ed.2d at 65, while perhaps implying that the judicial enforcement of unenumerated rights should be precluded, ibid., Justice Thomas nonetheless agreed "with the plurality that this Court's recognition of a fundamental right of parents to direct the upbringing of their children resolves this case." 530 U.S. at 80, 120 S.Ct. at 2068, 147 L.Ed.2d at 65. He reasoned that strict scrutiny was required and that under that standard of review the state "lacks even a legitimate governmental interestto say nothing of a compelling onein second-guessing a fit parent's decision regarding visitation with third parties." Ibid. Of necessity, the broad sweep of this concurrence reflects an implicit acceptance, if not endorsement, of the somewhat narrower principles expressed by the plurality. Thus, from a practical point of view, the opinion of Justice O'Connor represents the present state of the law on this subject.
After reviewing the relevant decisions, Justice O'Connor began her analysis of parents' rights with this observation:
In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning *545 the care, custody, and control of their children.
[530 U.S. at 66, 120 S.Ct. at 2060, 147 L.Ed.2d at 57.]
Addressing in particular the rights of a fit parent, she expressed the governing principle in these words:
[S]o long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.
[530 U.S. at 68-69, 120 S.Ct. at 2061, 147 L.Ed.2d at 58.]
Expanding on that theme, she observed that if the matter comes before a court and the parent is fit, the "court must accord at least some special weight to the parent's own determination." 530 U.S. at 70, 120 S.Ct. at 2062, 147 L.Ed.2d at 51. Implicit in her opinion is the recognition that parental rights in this sphere are not absolute, a point thoroughly discussed by Chief Justice Poritz in her dissenting opinion in W.P., 163 N.J. at 192-98, 748 A.2d 515.
While the principles of law articulated above underlie and frame to some extent our consideration of Tracy's dilemma, this case turns on another point made by the Troxel court, to which we referred earlier. Justice Kennedy's words, endorsed by the plurality opinion, 530 U.S. at 73, 120 S.Ct. at 2064, 147 L.Ed.2d at 61, bear repeating:
It must be recognized, of course, that a domestic relations proceeding in and of itself can constitute state intervention that is so disruptive of the parent-child relationship that the constitutional right of a parent to make certain basic determinations for the child's welfare is implicated. If a single parent who is struggling to raise a child is faced with visitation demands from a third party, the attorney's fees alone might destroy her hopes and plans for the child's future.
[530 U.S. at 101, 120 S.Ct. at 2079, 147 L.Ed.2d at 78 (emphasis added).]
Because the litigation itself "implicates" the parent's constitutional rights, a grandparent's statutory right to hale a parent into court must be carefully circumscribed, particularly where, as here, the parent's fitness is not disputed. Moreover, the restrictions we advance will enhance the Legislature's policy of encouraging contact between children and their grandparents by avoiding precipitous and acrimonious resort to the courts.
Suits of this nature occur when relations between the parent and grandparent have deteriorated. Before engaging the courts, grandparents should be obliged to make substantial efforts at repairing the breach and, in addition, litigation ordinarily should not be threatened before visitation has been denied with finality. If litigation becomes necessary because the parent or parents have persistently resisted the grandparents' respectful and patient overtures, it must be conducted with restraint. In other words, the grandparents must refrain from denouncing, demeaning, and impugning the parent's character. Cf. Smolen v. Smolen, 185 Misc.2d 828, 831, 713 N.Y.S.2d 903, 906 (N.Y.Fam.Ct.2000) ("While mere animosity between the parties is not considered sufficient to deny standing, if the animosity stems from the grandparents' behavior or attitudes, then standing will not be conferred." (Citation omitted) (emphasis added)).
This lawsuit violated those principles, which we believe are necessary to protect a parent's substantive due process rights. Plaintiffs showed little if any concern *546 for the effect on Tracy of her husband's recent and violent death. Although she became increasingly distant from them after the tragic event, and, according to Harry, made it "difficult" for them to see the children, she in fact permitted visitation on a number of occasions. Furthermore, completely absent from plaintiffs' certifications is any evidence of substantial efforts on their part to improve relations. Instead the opposite appears. For example, Harry repeatedly visited with Tracy's children in their school without her approval. When she confronted him on this issue, rather than apologize he claimed that he was within his rights because the school had not objected. Despite this affront, Tracy subsequently permitted a visit on December 26. A few weeks later, on January 13, 2000, plaintiffs asked to have the children visit with them four days later. Tracy's response was noncommittal. When the day passed for the proposed visit without a call from Tracy, plaintiffs apparently did not consider reaching out to her. Instead, they went to a lawyer who immediately sent Tracy the suit-threatening letter quoted above. When her attorney responded that Tracy believed it was not in the children's best interest to allow visitation "at this time," suit was filed almost immediately.
Once the action began, plaintiffs acted without restraint. In particular, Harry filed certifications asserting that Tracy was a liar, a slanderer, and a spendthrift who had caused her husband to overwork. Considering the nature of Russell Sr.'s death, that last charge was particularly hurtful. Harry also asserted that Tracy was vicious, vindictive, and greedy, and that she was "destroying our grandchildren."
The effect of plaintiffs' behavior on Tracy and the children was explained by Dr. Rosenberg. Unless she participated in therapeutic mediation with plaintiffs, visitation would aggravate her "anger and sense of betrayal" and would "significantly impact on the children in a negative way."
As previously noted, on Tracy's motion for leave to appeal, we summarily reversed the trial court's order requiring her to participate with plaintiffs in therapeutic mediation with a psychologist. We took that course because in this context the order appeared to be a substantial invasion of Tracy's right to privacy. After further review, we reconfirm that ruling. Cf. Griswold v. Connecticut, 381 U.S. 479, 484-86, 85 S.Ct. 1678, 1681-82, 14 L.Ed.2d 510, 514-16 (1965). While there may be circumstances in which a fit parent is obliged to submit to psychological treatment in the context of a visitation action, they are not present here. A grandparent cannot demean a parent in the manner that took place here and then insist the parent engage in psychological therapy because without it visitation would be inconsistent with the child's best interest.
For all of the above reasons, we hold that the GVS is unconstitutional as applied to the circumstances of this case.
Defendant's contention that the trial court erred in refusing to recuse itself is without sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E). Therefore, we remand for the sole purpose of permitting Tracy to apply to the trial court for an award of counsel fees and costs, to include the cost of the proceedings in this court, pursuant to R. 5:3-5(c) and R. 2:11-4.
Reversed and remanded.