837 A.2d 436 (2002)
364 N.J. Super. 561
P.T., A.T. and H.T., Plaintiffs-Appellants,
v.
RICHARD HALL COMMUNITY MENTAL HEALTH CARE CENTER; Amy Kavanaugh; Madelyn Smith Milchman; Madelyn Smith Milchman Firm; Margaret C. Blackburn; Resource Center for Women and their Families of Somerset County, John Doe(s); Jane Doe(s); and XYZ Firm(s), Defendants, and
Amy Kavanaugh, Third-Party Plaintiff,
v.
M.T., now known as M.S., Third-Party Defendant.
Superior Court of New Jersey, Law Division, Somerset County.
Decided June 3, 2002.
*439 Robert B. Gidding, Merion Station, PA, for Plaintiffs.
John G. Tinker, Jr., Leary, Bride, Tinker & Moran, Cedar Knolls, for Defendant and Third-Party Plaintiff Kavanaugh.
Steven A. Weiner, Picillo Caruso, West Orange, for Defendant and Third-Party Plaintiff Milchman.
Scott D. Rodgers, Deputy County Counsel, for Defendants County of Somerset and Richard Hall Community Mental Health Center.
M.S. (appearing pro se) (Identity and current address under seal). *437
*438 HELEN E. HOENS, J.S.C.
This matter comes before the court in the context of the motion filed by the remaining defendants, Amy Kavanaugh, County of Somerset and Richard Hall Community Mental Health Center (hereinafter "Richard Hall") for summary judgment. Because the motion raises questions of first impression in New Jersey, we address the issues at length.
The litigation before the court can best be described as a claim for professional negligence brought against Amy Kavanaugh, a psychologist, and her employer Richard Hall, an agency of Somerset County. The plaintiffs are P.T., the natural father of A., and A.T. and H.T., the natural paternal grandparents of A. Because of this court's prior decisions, the only other remaining party to this action is M.S., the former spouse of P.T. and the natural mother of A., who is a third-party defendant added to the litigation by Kavanaugh on what amounts to a contribution or comparative negligence theory. An explanation of the factual and procedural history of the underlying matrimonial litigation which gives rise to this action is necessary for an understanding of the result we reach on these motions. Much of the factual background and much of the procedural history of the underlying dispute between P.T. and M.S. is recited in the decision of the Appellate Division in P.T. v. M.S., 325 N.J.Super. 193, 738 A.2d 385 (App.Div.1999) and will be repeated herein only as needed for clarity.
P.T. and M.S. are the natural parents of A. Their short marriage was punctuated by domestic violence, which resulted in the entry of a final restraining order. Of relevance to this matter, P.T. and M.S. were married early in 1989 and A. was born in *440 August of that year. They separated May of 1991 and P.T. filed for divorce in June of 1991. M.S. first contacted Richard Hall with allegations that P.T. had sexually abused A. in December 1992, and defendant Kavanaugh was designated to serve as the evaluating and treating therapist. While a pediatrician who examined A. could not independently verify that any sexual abuse had occurred, and while both DYFS and the county prosecutor's office concluded that the allegations could not be substantiated because A. was inconsistent and non-communicative in interviews, M.S. was granted sole custody of A. and visitation with P.T. was terminated for a time. The court appointed Dr. Madelyn Milchman, formerly a defendant in this action, to conduct an independent psychological evaluation and appointed an attorney to act as A.'s guardian ad litem. Thereafter, A. continued in therapy with Kavanaugh who saw her over the course of nearly three years for a total of 101 sessions. Kavanaugh was aware of the ongoing divorce proceedings between M.S. and P.T. and was aware of their dispute concerning visitation between A. and her father and paternal grandparents. Kavanaugh was contacted by DYFS for whom she prepared a treatment summary of her sessions with A. and she provided information to the Family Part, in the form of at least one certification, in connection with proceedings relating to visitation between A. and her father and grandparents.
The proceedings between P.T. and M.S. respecting visitation were protracted and difficult. Eventually, after several failed attempts urged by therapists and the Family Part judge seeking to effect a reunification between P.T. and A., the dispute was reassigned to a different Family Part judge. She concluded that reunification would be impossible because, whether the abuse had in fact occurred or not, A. fervently believes that it did and that consciously or unconsciously both A. and M.S. would undermine any efforts in the direction of any reunification with A.'s father or her grandparents. In fact, the record in the Family Part is replete with verbal expressions by A. of her belief that she has been abused and of her fear of P.T., reports of observations by therapists and counselors of objective manifestations of that belief and of that fear and objective physical sequelae of that belief and fear in the form of stomach aches and nightmares temporally related to suggestions of any impending renewal of contact with P.T. or his parents.
This civil litigation was commenced at a time when the visitation issues were still being contested and was stayed by this court repeatedly in the hope that a resolution in the Family Part proceeding might positively affect this matter and permit it to be amicably resolved. Here, plaintiffs contend that Kavanaugh essentially misdiagnosed A., determining that she had been abused when in fact she had not, then campaigned both with M.S. and on her behalf through the courts in a grossly negligent effort to intervene where no intervention was appropriate, thus destroying any hope of a parent-child relationship between P.T. and A. or a grandparent-grandchild relationship between A.T. and H.T. and A. Plaintiffs contend that Kavanaugh was negligent in her evaluation and treatment of A. both in crediting the subjective information provided by A. and M.S. as to the fact of abuse, and in failing to assist A. in overcoming her fears, rendering any ultimate determination about the truth of the abuse allegation impossible and making reunification similarly impossible. Plaintiffs contend that Kavanaugh was not only negligent but that she violated their fundamental constitutional rights.
Defendants Kavanaugh, Richard Hall and the County of Somerset assert that *441 they are entitled to summary judgment because there is no legally cognizable cause of action on behalf of either the natural father P.T. or the paternal grandparents H.T. and A.T. against this mental health professional. They contend that they owed no duty of care to any of these plaintiffs and contend that even if a duty of care were owed to these plaintiffs, defendants' conduct, however described, did not proximately cause any of the harm which plaintiffs assert they have suffered. Moreover, defendants contend that the plaintiffs do not have a legally cognizable cause of action for a violation of their constitutional rights as would fall within the parameters of and be redressable as a section 1983 civil rights action, 42 U.S.C. § 1983, as plaintiffs assert. In the alternative, defendants contend that there are statutory and common law privileges and immunities which completely insulate them from all of plaintiffs' claims in this action, including the litigation privilege, a statutory privilege based upon DYFS reporting requirements, discretionary activity immunity afforded these defendants by the New Jersey Tort Claims Act, and a qualified immunity or an absolute immunity which protects expressions of matters of opinion. Plaintiffs oppose the motion, contending that they are entitled to proceed to trial by jury on both of their legal theories and arguing that no privilege applies to these defendants or their actions.
Counsel for plaintiffs contends that, while the issue has not been decided in this state, courts in four other jurisdictions have recognized a duty of care of a therapist to a parent. Relying on the decisions of the courts in Wisconsin, Sawyer v. Midelfort, 227 Wis.2d 124, 595 N.W.2d 423 (1999) (recognizing right of parent wrongly accused of sexual abuse to sue unlicensed therapist engaging in recovered memory therapy), in New York, Caryl S. v. Child & Adolescent Treatment Serv. Inc., 161 Misc.2d 563, 614 N.Y.S.2d 661 (Sup.Ct.1994), aff'd, 238 A.D.2d 953, 661 N.Y.S.2d 168 (Ct.App.1997) (recognizing right of grandparent to sue therapist for grossly negligent misdiagnosis of sexual abuse), in New Hampshire, Hungerford v. Jones, 143 N.H. 208, 722 A.2d 478 (1998) (recognizing right of father to sue social worker who engaged in false recovered memory therapy), and in Colorado, Montoya v. Bebensee, 761 P.2d 285 (Colo.Ct.App.1988) (recognizing right of divorced father to sue unlicensed, untrained therapist who reported sexual abuse based on analytical method not recognized or sanctioned within the profession as reliable), plaintiffs urge this Court to recognize a cause of action in favor of these plaintiffs for negligent diagnosis of the child. Resting their arguments on the obvious foreseeability of harm to the accused parent if the abuse accusation is false or if the condition of having been abused is misdiagnosed, and pointing to the high likelihood of harm to the accused parent or grandparent which will result in that event, plaintiffs contend that their right to proceed should be recognized.
Defendants argue that all of the cases plaintiffs rely on are distinguishable and cite decisions from seven other jurisdictions where courts have refused to recognize a cause of action on behalf of a parent accused of abuse. Defendants contend first that plaintiffs have incorrectly analyzed cases addressing the recently created "recovered memory" therapy, arguing that this psychological theory is so controversial and so fraught with unfairness that the recognition of a cause of action arises in part from the unreliability of the therapy in and of itself. Defendants next contend that the courts in jurisdictions which have confronted the precise issue before this court have uniformly concluded that there is no duty owed by the therapist to *442 the alleged abuser. See Althaus v. Cohen, 562 Pa. 547, 552, 756 A.2d 1166, 1168 (2000) (recognizing "special nature of the relationship between a therapist and a child patient in cases of alleged sexual abuse" requires duty to patient and not to alleged abuser); Flanders v. Cooper, 706 A.2d 589, 591 (Me.1998) (refusing to recognize duties of care that might intrude on patient-therapist relationship); Doe v. McKay, 183 Ill.2d 272, 282-83, 233 Ill.Dec. 310, 700 N.E.2d 1018, 1023-24 (1998) (refusing to recognize duty of care owed by therapist to third parties in light of fundamental inconsistency with obligation owed to patient); Zamstein v. Marvasti, 240 Conn. 549, 559-61, 692 A.2d 781, 786-87 (1997) (holding that recognizing duty of professional to abuser would be contrary to public policy); Bird v. W.C.W., 868 S.W.2d 767, 769 (Tex.1994); cf. Trear v. Sills, 69 Cal.App. 4th 1341, 1351, 82 Cal.Rptr.2d 281, 288, (Ct.App.1999) (recognizing that creating duty to alleged abuser would subject therapist to untenable conflict). Based on the analysis in these decisions, defendants contend that this court should likewise refuse to create a duty to these plaintiffs.
We begin with the observation that the standards that apply to the claims raised by P.T., the natural father of the minor child A., and those standards that apply to the claims raised by H.T. and A.T., the child's grandparents, are somewhat different, as a result of which we address them separately. We turn first to plaintiffs' theory that defendants are liable to them essentially on a theory of professional negligence and to the issue raised by defendants concerning whether these defendants owed any of the plaintiffs a duty of care sufficient to support a recovery by them. Defendants first argue that none of the plaintiffs has established that there is a legally cognizable negligence-based cause of action against the mental health professional and her employer. Stated most concisely, the cause of action asserted is essentially one for a negligent misdiagnosis of the child. Plaintiffs' theory in essence is that the defendants deviated from accepted standards of care in improperly diagnosing the minor child A. as having been the victim of sexual abuse at the hands of her father. The threshold issue, therefore, is whether or not there is indeed a cause of action running in favor of these plaintiffs respecting the minor child.
It is well established that liability in any negligence case must be premised upon a finding of a duty, a breach of that duty, and the proximately caused injuries and damages which flow from that breach. Anderson v. Sammy Redd & Assoc., 278 N.J.Super. 50, 56, 650 A.2d 376, 379 (App.Div.1994), certif. denied, 139 N.J. 441, 655 A.2d 444 (1995). Whether or not a legal duty exists within any given set of facts is a question of law to be decided in the first instance by the court and not to be decided by the jury. Wang v. Allstate Ins. Co., 125 N.J. 2, 15, 592 A.2d 527, 534 (1991). In determining whether there is a duty which exists in any given situation, the court must engage in a complex analysis that balances a number of related factors including the risk, the foreseeability, or the likelihood of injury all weighed against the social utility of the actor's conduct, the opportunity and ability to exercise care to prevent the injury and the consequences of placing the burden of the duty on the actor. J.S. v. R.T.H., 155 N.J. 330, 337, 714 A.2d 924, 928 (1998) (citing Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439, 625 A.2d 1110, 1116 (1993)). As our Appellate Division has recently held, "it is well-settled that the existence of [the] duty is a question of law to be determined by the court as a matter of fairness and policy and by `weighing the relationship of the parties, the nature of the risk, and the *443 public interest in the proposed solution.'" Ranier v. Frieman, 294 N.J.Super. 182, 189, 682 A.2d 1220, 1223 (App.Div.1996) (quoting Strachan v. John F. Kennedy Mem'l Hosp., 109 N.J. 523, 529, 538 A.2d 346, 349 (1988)). We turn, then, to the issue of whether a mental health professional who has evaluated and treated a minor child alleged to be the victim of sexual abuse owes a duty of care to the non-custodial parent or to the minor child's grandparents.
Plaintiffs suggest that our Supreme Court, in J.S. v. R.T.H., supra, 155 N.J. 330, 714 A.2d 924 (1998), defined duties of care in the context of sexual abuse allegations broadly and protectively, thus signaling that the Court would recognize the cause of action asserted here. Plainly, however, plaintiffs have misunderstood the intent and scope of the Court's analysis in that dispute. In J.S., the Court broadly defined duties owed, to be sure, but did so to create duties to protect the alleged victims, creating in the end a duty of a wife to reveal information about her spouse's abusive tendencies to his detriment as an avenue for the protection of the minor children of their neighbor. Id. at 352, 714 A.2d at 935. Plaintiffs' suggestion that the breadth of the J.S. ruling militates analytically in their favor therefore stands the Supreme Court's analysis on its head, overlooking the fact that while plaintiffs assert that A. was never abused, the analysis of duties owed must proceed from the assumption, in an abundance of caution to be exercised for the benefit of the child, that the abuse occurred. Unlike J.S., where the duty runs to the parent of the victim and where the duty arises even as between the spouses to the detriment of the spousal relationship for the benefit of the minor children, in the case before this court the alleged abuser, whether wrongly accused or not, seeks to have a duty run to him potentially at the expense of the therapeutic relationship beneficial to the child. Nothing in J.S. or its reasoning implies such a result or suggests that such an analysis of duties owed would be appropriate. On the contrary, the overwhelming thrust of J.S. is the recognition of our need to protect children from even the potentiality of abuse and not, as P.T. suggests, any recognition of a right of the accused abuser.
Turning to the more technical aspects of the duty analysis, the first prong of the test set forth by our Appellate Division and Supreme Court respecting the existence of a duty of care, namely the relationship between the parties, in this circumstance must focus on the relationship between the parties to the litigation and not the parties to the therapeutic relationship. The distinction is significant, for the focus of the inquiry must look to the relationship, if any, between the mental health professional performing evaluation and treatment of the minor child and the non-custodial parent alleged to be the child's abuser. Indeed, in the context in which there is a true therapeutic relationship between the minor child and the therapist, as plainly was the case with Kavanaugh and A., we are particularly mindful of the risk that establishing a duty running from that therapist to the non-custodial accused parent would threaten that fundamentally important therapeutic relationship. Viewed in this light, it is clear that the relationship between the mental health professional Kavanaugh and the non-custodial parent P.T. is absent. P.T. neither sought her aid nor participated in any way in her treatment or her evaluation of the minor child. In fact, it is undisputed that Kavanaugh had no interactions whatsoever with P.T. While it might well be true that in an intact family unit the duty of care respecting treatment of the child might extend to both parents, in the situation in *444 which the family unit has been fractured and the child given over even temporarily to the custody of one, there can be no duty of care owed to the non-custodial parent. And even in an intact family unit, there can be no duty running between the child's therapist and the alleged abuser.
Apart from the devastating consequence that determining that a duty is owed by the mental health professional to the non-custodial or allegedly abusive parent would certainly have to the therapeutic relationship between the therapist and the child, P.T.'s own articulation of the duty itself makes clear that his claim is without merit. P.T. claims that he has been damaged in multiple ways by Kavanaugh's actions and opinions, but fundamentally his complaints amount to essentially two. First, he contends that he has lost, as a result of Kavanaugh's actions and her opinions, the ordinary bonds enjoyed between a parent and a child fueled by what he views as a misdiagnosis of the child as the victim of sexual abuse. Second, however, he contends that he has been damaged because he has been wrongly accused of sexual abuse of his own child by Kavanaugh as if his claim were for defamation rather than negligence. Neither of these contentions, however, rests on any fundamental relationship between P.T. and Kavanaugh at all. In the final analysis, there simply was no relationship between the two, and her duty must be bounded only by her duty to the child.
Indeed, her duty is limited even as it relates to M.S., the custodial parent and the actual accuser of P.T. Her only duty to M.S. is as an expression of her duty owed to the child. Because the child cannot act on her own behalf and must in matters relating to her care act through the custodial parent, M.S., the duty owed by Kavanaugh even to M.S. is, in reality, a derivative one. It is a duty owed fundamentally to the child and expressed only through the parent. In this analysis, the fundamental flaw in P.T.'s argument is his belief that he has been personally damaged and that he, therefore, should be made whole by those he blames for his unfortunate losses. While the Appellate Division itself has made clear that further inquiries into the issue of whether this child was ever actually the victim of sexual abuse would not be productive, see P.T. v. M.S., supra, 325 N.J.Super. at 221, 738 A.2d at 400, that does not and cannot equate with a finding that the abuse itself did not occur. In the context of a trial of any issues relating to the abuse, evidence would necessarily be offered relating to that issue and a jury would find in accordance with that evidence, but the fundamental focus of P.T.'s complaint is his own loss and not on any loss which may have been caused to the minor child. There is in that analysis no relationship, professional or otherwise, between him and the individuals to whom M.S. turned for the evaluation and treatment of her daughter, and therefore no relationship from which any duty owed to him might be derived.
In a like manner, the claims of H.T. and A.T. are even more attenuated. As grandparents to the child, they have no relationship whatsoever with the therapist for the child. The rights of grandparents, while they are certainly protected by statute, see N.J.S.A. 9:2-7.1(b), are far more limited than the rights enjoyed by the natural parents. Wilde v. Wilde, 341 N.J.Super. 381, 775 A.2d 535 (App.Div.2001). There is simply no duty owed to them by the therapist engaged by M.S. for the treatment of her child.
Defendants urge that for public policy reasons this Court should refuse to find a duty of care flowing from the therapist to the non-custodial, accused parent in this case. They point out that balancing the rights of the plaintiffs against the *445 rights of the other parties, there is simply no risk to be avoided by the creation of the cause of action that plaintiffs demand. Certainly it is true that duties of care owed by professionals to their patients or in the case of a minor child to the patient's parent, are important duties for they safeguard all of us from excesses at the hands of professionals of one kind or another. Here there is indeed a duty owed by the professional Kavanaugh to her patient, A. and to the extent that the duty is owed to A. herself certainly the breach of that duty would be a significant one. Beyond that, however, the duty runs as well to the custodial parent M.S. and it is she who is charged with not only the right but as well with the responsibility to act in the best interest of her child with respect to any perceived breach of the duty. We would have no difficulty holding, for example, if Kavanaugh had ignored obvious signs of sexual abuse and had reported to M.S. that the child had never been abused that M.S. would have a right to proceed in malpractice or professional negligence as against that treating or evaluating therapist. There is nothing, however, inconsistent with that careful safeguarding of the interest of the minor as expressed by the custodial parent in finding the non-custodial parent does not enjoy the same right. This is especially true when it is the non-custodial parent himself who is the subject of the claim of abuse, for to put into that individual's hands the tools to pursue the professional he believes has harmed him through an action in professional negligence would be to potentially so chill the exercise of the professional's judgment as to work to the harm of the great number of minor children in similar circumstances. For these reasons, we are persuaded that there is no legal duty owed by these defendants to any of these plaintiffs.
In the interest of creating a complete decision for the parties in the event that they choose to pursue an appeal, however, our analysis of the facts and issues before the Court must proceed. In the alternative, defendants seek summary judgment on the ground that there is no evidence on which a finder of fact could find that any act of Kavanaugh or these defendants proximately caused any of the injuries, damages or losses which the plaintiffs assert. While it is certainly true that proximate cause is ordinarily a matter to be determined by the finder of fact, in this case a jury, and only to be decided by the court in "highly extraordinary circumstances", J.S. v. R.T.H., supra, 155 N.J. at 351-52, 714 A.2d 924 (citing Martin v. Bengue, Inc., 25 N.J. 359, 374, 136 A.2d 626, 633-634 (1957)), it is equally true that summary judgment on this alternate ground is appropriate where there is no evidence to support the causal link between the claimed act of negligence and the damage alleged. In this regard, defendants point out that plaintiffs contend that Kavanaugh influenced judges in their determination that visitation with A. should be restricted, that she influenced M.S. to continue her fight to resist resumption of visitation between P.T. and A., that she influenced the court-appointed guardian ad litem to, in essence, side with Kavanaugh in her view that A. had been the victim of abuse such that visitation or contact should be restricted and that she reinforced the view held by A. that she was, in fact, the victim of abuse at the hands of her father. As defendants point out, however, there is no evidence anywhere in the voluminous record to support any connection between anything that Kavanaugh did or attempted to do and any of the acts which ultimately led to plaintiffs' loss of their enjoyment of the relationship with A.
*446 Respecting the allegation that Kavanaugh utilized her influence to cause the Family Part judge charged with handling this matter to restrict visitation, each of the judges who was initially confronted with the abuse allegations and the requests to limit visitation essentially ignored Kavanaugh and her opinions, whether those opinions were solicited by the court or not. As an example, in an April 21, 1993 letter to Judge Ross Kavanaugh recommended that visitation not be permitted between A. and her grandparents, a recommendation Judge Ross refused to follow, ordering in its place that visitation would be permitted. Later, when Kavanaugh wrote to Judge Dilts, then charged with handling the proceedings, recommending that therapeutic visitation between A. and her father P.T. be prohibited, Judge Dilts, in fact, ordered that the visitation take place. While plaintiffs assert that Kavanaugh went beyond the role of a therapist or an evaluator and actively sought to interfere in the parent-child or grandparent-grandchild relationships on which they base at least a part of their cause of action, the simple fact of the matter is that even if she attempted to do so, all of her efforts in that regard were for naught as neither of the judges to whom she made those recommendations followed her advice.
Similarly, with respect to the contention that it was Kavanaugh who exerted influence over M.S. to cause M.S. to move forward and resist either reunification or efforts to permit visitation between the plaintiffs and A., in fact, the only evidence in the record before the court is that M.S. firmly held the belief that her daughter had been the victim of sexual abuse at the hands of the plaintiffs and that her beliefs were based upon verbal communications from the child and behavioral manifestations of an unwillingness to be alone with the plaintiffs, all of which preceded any involvement of Kavanaugh in evaluation or therapy. Indeed, the record is clear that nothing Kavanaugh said or could have said to M.S. would have altered her view of the facts as she understood them or of what was then and is now in the best interest of her child.
Similarly, the suggestion that Kavanaugh unduly exerted influence over the court-appointed guardian ad litem is without merit. As the defendants point out, the guardian ad litem herself reported that she witnessed behaviors exhibited by the child consistent with a history of sexual abuse while supervising visitation between A. and P.T. Indeed, in her lengthy affidavit to the court outlining the reasons why she, as the guardian ad litem, believed that even supervised visitation would be inappropriate, she made no mention at all of Kavanaugh or her views, while referring repeatedly to her personal observations of the child and her conversations with a different court-appointed psychologist and with M.S. herself as the basis for her recommendations.
Finally, there is no evidence to support any suggestion that Kavanaugh in some fashion reinforced beliefs that A. had as to having been abused or being fearful of being alone with her father. While the fact that A. continued and apparently still continues to cling to the belief that she has been abused and continued to resist all efforts to reunite her with her father and her paternal grandparents long after her therapy with Kavanaugh had ended is on its face ambiguous with respect to any impact Kavanaugh might have had on her beliefs, there is no evidence that A.'s heartfelt belief in the truth of the allegations she made as to her father did not predate her contact with Kavanaugh and, objectively, there is no evidence to support the proposition that she believes it is true because of Kavanaugh as opposed to believing *447 it is true because it is true. For this alternate reason, therefore, while proximate cause is ordinarily a question for the jury, as the Supreme Court reminded the trial courts in Brill v. Guardian Life Ins. Co., 142 N.J. 520, 666 A.2d 146 (1995), when the evidence is so one-sided that the non-moving party cannot prevail as a matter of law on an issue, then summary judgment on that issue is appropriate. Id. at 536, 666 A.2d at 154.
Defendants next move for summary judgment on the section 1983 and constitutionally based claims. The plaintiffs claim that the conduct of defendants violated their "clearly established constitutional rights to family relationships of persons falsely accused of sex abuse" and the "constitutional rights of plaintiffs to associate with, parent and have a relationship with their child and granddaughter."
In order to prevail on a section 1983 claim, 42 U.S.C. § 1983, the plaintiffs must establish that "the conduct complained of was committed by a person acting under color of state law and that the conduct deprived [the plaintiffs] of rights, privileges or immunities secured by the constitution or laws of the United States." Shaw by Strain v. Strackhouse, 920 F.2d 1135, 1141-42 (3d Cir.1990)(quoting Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420, 428 (1981)). For the purposes of this argument, we presume that Richard Hall, an entity created by the County of Somerset, and Kavanaugh, an employee of that entity, fall within that part of the requirement for a section 1983 action relating to having acted under color of state law. The question before this court, however, is whether or not any of their actions deprived plaintiffs of fundamental rights secured by the laws of the state or the constitution.
Plaintiffs argue that they have been deprived of a fundamental right to raise and enjoy their child and grandchild. Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599, 606 (1982); Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972); Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, 1660 (1942). While courts have long held that the interests of parents and particularly their interests with respect to their children is of a high order, courts have equally held that their rights may be abridged when competing demands of an organized society outweigh those interests. Youngberg v. Romeo, 457 U.S. 307, 320, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28, 40 (1982). Here the constitutional right to a relationship with one's child must be subordinate to the welfare and the best interests of the child. See State v. P.Z., 152 N.J. 86, at 99, 703 A.2d 901, at 908 (1997); In re Guardianship of J.C., 129 N.J. 1, 8, 608 A.2d 1312, 1315 (1992).
New Jersey has a strong policy designed to protect children from sexual abuse and to require the reporting of suspected abuse of children which our Supreme Court has recently described as sweeping. J.S. v. R.T.H., supra, 155 N.J. at 348, 714 A. 2d at 933. In its effort to foster this policy of protection of children, our Legislature has dealt comprehensively with the subject of child abuse and has enacted numerous statutes designed to prevent the sexual abuse of children and to protect suspected victims of such abuse. Id. Included among these diverse statutory protections are the requirement that any person having reasonable cause to believe that a child has been subject to abuse report the abuse immediately to DYFS, N.J.S.A. 9:6-8.10, and that any person who stands in loco parentis to a child and knowingly permits or acquiesces in sexual abuse of the child by another person in the household is guilty of sexual abuse, N.J.S.A. *448 2A:61B-1a(1). Further evidence of the State's strong stance in protecting children from sexual abuse are the statutes which establish the New Jersey Task Force on Child Abuse and Neglect, N.J.S.A. 9:6-8.75, and the laws which require community notification and registration requirements relating to sexual offenders. N.J.S.A. 2C:7-1 to 11 (Megan's Law).
Other statutes specifically cited by our Supreme Court in J.S. as further evidence of this protection, see J.S. v. R.T.H., supra, 155 N.J. at 344 n. 3, 714 A.2d at 931 n. 3, include N.J.S.A. 2C:14-4b(1) (making lewdness a crime of the fourth degree if the actor knows or reasonably expects that he is likely to be observed by a child under the age of 13); N.J.S.A. 2C:24-4 (making it a crime for a person who has a legal duty to care for a child to engage in sexual conduct that would impair the morals of the child); N.J.S.A. 2C:43-6.4a (providing for enhanced penalties for persons convicted of sexual assault of a child or endangering the welfare of a child); N.J.S.A. 2C:52-2b (precluding expungement of records of conviction for endangering the welfare of a child by engaging in sexual conduct); N.J.S.A. 30:4-123.53b (mandating that the Department of Corrections provide written notification to county prosecutors of the anticipated release from incarceration of a person convicted of sexual assault of a child); N.J.S.A. 30:4-123.54b(1)(b) (mandating preparation and filing with Parole Board of report containing psychological evaluation for every person who is convicted of sexual assault or endangering the welfare of a child); and N.J.S.A. 30:8-44.1a (mandating that inmates convicted of a crime involving sexual offense or child molestation be excluded from work release and vocational training release programs).
In the face of these strong and comprehensive expressions of policy from the Legislature and from our Supreme Court, plaintiffs' constitutional claims must fail. While it is indeed true that there is a recognized constitutional right to parent, it is equally true that our Supreme Court has recognized that it is "limited when the physical or mental health of children is jeopardized." In re Guardianship of J.C., 129 N.J. 1, 8, 608 A.2d 1312, 1315 (1992). Similarly, the Court has recognized that when parental rights and protective concerns for children are in conflict "those rights are not in equipoise." State v. P.Z., supra, 152 N.J. at 112, 703 A. 2d at 914. Rather, when those competing interests collide, the concern for protecting children is paramount. Even were we to consider the constitutionally based claims of these plaintiffs nonetheless, they would also fail for want of any proximate connection between Kavanaugh and the ultimate loss these plaintiffs have sustained. All of their arguments about interference with their rights as parents or grandparents were given a full, fair and complete hearing in the proceedings in the Family Part, the proper forum for the assertion of and, if appropriate, recognition of those rights. There is simply no basis on which those rights can proceed in this forum.
Finally, defendants contend that they are entitled to dismissal of the complaint on the ground that one or more of a variety of common law or statutory privileges or immunities protect their actions with respect to these plaintiffs. They rely on the litigation privilege, the statutory privilege relating to immunity for reporting to DYFS, a privilege relating to discretionary activities recognized by the New Jersey Tort Claims Act, a qualified immunity analysis or, in the alternative, the application of an immunity they refer to as pure opinion immunity. We address each of these briefly in turn.
*449 First, respecting the litigation privilege, the defendants contend that every action taken by them with respect to these plaintiffs was taken in the context of ongoing litigation, that all of the communications made by defendants and on which plaintiffs rely for their cause of action were undertaken in the course of ongoing litigation as a result of which they are absolutely privileged. They point, for support, to the well-established and lengthy line of decisions recognizing the existence of a litigation privilege. See, e.g., Hawkins v. Harris, 141 N.J. 207, 215, 661 A.2d 284, 288-89 (1995); Hill v. N.J. Dept. of Corrections, 342 N.J.Super. 273, 294, 776 A.2d 828, 839-40 (App.Div.2001), certif. denied, 171 N.J. 338, 793 A.2d 717 (2002); Peterson v. Ballard, 292 N.J.Super. 575, 581, 679 A.2d 657, 659-60 (App.Div.), certif. denied, 147 N.J. 260, 686 A.2d 761 (1996). Based upon these precedents, they contend that any and all statements made by them and any and all actions undertaken by them are completely protected.
Plaintiffs oppose this aspect of the motion contending that the litigation privilege is far more narrow than the reach that would be recognized were this court to cloak the statements and actions of these defendants in immunity. Plaintiffs contend that Kavanaugh went well beyond any protected activity and in effect became an advocate for outcomes and determinations she believed were justified notwithstanding the fact that they were based, in plaintiffs' view, on grossly negligent, reckless and careless accusations leveled by her against plaintiffs. Moreover, plaintiffs contend that their claims as against Kavanaugh rest not on communications she made or may have made to the judge or to court personnel, but rather upon communications and statements she made to M.S. or to the minor child A. relating to her views that A. had been the victim of sexual abuse at the hands of P.T. Moreover,
plaintiffs contend that there is little evidence that Kavanaugh was requested to communicate any recommendations to the court and they suggest that as a result her communications are not cloaked in the litigation privilege as they amount to merely her own unsolicited interference in the matter. For these reasons, plaintiffs argue that nothing in Kavanaugh's behavior falls within the litigation privilege. Indeed, plaintiffs suggest that Kavanaugh improperly mixed her therapeutic role with a role of advocacy which had never been requested of her, itself in plaintiffs' view a violation of her ethical obligations.
First, it is clear beyond any significant doubt that the communications and statements made by Kavanaugh to either of the Family Part judges who were involved in the underlying action or to others within the court system were plainly made in the context of the litigation and plainly therefore are cloaked in the litigation privilege. Similar to the status of a court-appointed expert, although admittedly not identical to the position enjoyed by a court-appointed expert, it is clear that recommendations made by Kavanaugh either to the court system, or in the context of the order directing that she make her recommendations to the parties, fall within the litigation privilege. The rationale underlying the litigation privilege itself would be undercut were we to conclude that a therapist such as Kavanaugh in a setting such as this is not entitled to rely on that privilege. The privilege rests on the need to ensure complete candor and forthright, open and honest communication of her views based upon her evaluation and therapy with this child, all of which would be severely compromised were we to determine that the privilege does not apply here.
*450 Respecting the suggestion now made by plaintiffs that Kavanaugh's statements to M.S. or to A. are not protected by the litigation privilege, while clearly those statements made directly to the child were outside the parameters of that privilege, numerous other privileges would apply to protect statements made to the child who is in every significant sense of the word the patient of Kavanaugh. Respecting the statements made, if any, by Kavanaugh to M.S. there can be little doubt but that those statements in fact fall within the litigation privilege as they took place in the context of proceedings sanctioned by the court, authorized by the court and ancillary to the underlying Family Part dispute. Were we to suggest that a parent of a child involved in a dispute in which an issue concerning sexual abuse of the child arises cannot in absolute privilege communicate with a therapist we would undermine the important rights to be protected by privileges in general and by the litigation privilege in particular.
Defendants urge as well that the reporting immunity which protects and which indeed requires any person having reasonable cause to believe that a child has been abused to report that abuse to DYFS, N.J.S.A. 9:6-8.14; F.A. by P.A. v. W.J.F., 280 N.J.Super. 570, 576, 656 A.2d 43, 46 (App.Div.1995); also protects Kavanaugh. Plaintiffs suggest that at most Kavanaugh's initial report to DYFS of her suspicions concerning abuse would fall within that protection and argue again that she went beyond the bounds of that protection by sending DYFS an update of her views based on her continuing evaluation. Certainly it is clear in the record before this court that while neither DYFS nor the prosecuting authorities found that the initial report would support taking any action against these plaintiffs through DYFS or in the criminal courts, DYFS directed Kavanaugh to report again in the event that further information was disclosed which might support the initial report or might indicate new acts of abuse of the child. It is clear therefore that where the initial report is insufficient for action to be taken, the follow up reporting requirement must be seen as precisely that, namely, a requirement that further acts or further information also be reported to DYFS for its investigation.
There is no evidence at all that Kavanaugh in sending further information based upon her continuing therapy with and evaluation of the child to DYFS did anything other than attempt to comply with this directive. And while plaintiffs paint Kavanaugh as being engaged in a misguided if not absolutely evil campaign against them, there is no evidence that in fact she did anything with respect to reporting to DYFS beyond that which she justifiably believed was required of her. Once again, it is clear that our Legislature's view of the need to protect children and particularly the need to protect children from potential acts of sexual abuse is extremely strong and the numerous statutes enacted with a purpose of protecting children must guide our evaluation of the scope of the statute on which the defendant here relies. There can be no question but that her reporting was squarely within the protective ambit of the DYFS statute and indeed was required of her consistent with the mandates of that statute. As a result, there can be no question but that her reports and communications to DYFS and its case workers respecting this child, her evaluation of this child, and her continuing therapy with this child, all fall squarely within the parameters of that statute.
Defendants next rely upon three other kinds of immunities which we need address only briefly, namely, the discretionary *451 activity immunity provided by the New Jersey Tort Claims Act, the doctrine of qualified immunity, and the doctrine of pure opinion immunity. Defendants assert with little discussion that all of Kavanaugh's activities are discretionary and therefore cloaked in immunity. The plaintiffs contend that the discretionary immunity protections provided by the Tort Claims Act simply do not apply to any of the activities undertaken by Kavanaugh. Without belaboring the analysis unduly, it is crystal clear that the discretionary activity immunity provided in the Tort Claims Act relates to policy-making decisions at high government levels and not to the rather ordinary functioning of government employees such as Kavanaugh. N.J.S.A. 59:2-3; Tice v. Cramer, 133 N.J. 347, 375, 627 A.2d 1090, 1105 (1993). There is no ground on which to find that discretionary immunity provided under the Tort Claims Act in any way applies to the allegations raised in this litigation as a result of which we reject defendants' contentions that this statutory immunity similarly bars plaintiffs' claims.
Nor is there any ground on which to conclude that the related doctrine of qualified immunity arising from discretionary functions relates in any way to Kavanaugh's activities. Even were we convinced that Kavanaugh is entitled to assert a claim of qualified immunity, that determination would not entitle her to a dismissal of the claims against her but would merely entitle her to proceed to a trial on the issue relating to abuse of discretion. For this reason, given that we have granted defendants' summary motion on other grounds, we do not reach the issue of whether, if these claims could proceed, Kavanaugh might be entitled to assert a qualified immunity defense.
Nor, for that matter, do we address the pure opinion analysis raised by defendants. The pure opinion analysis is in fact not so much an immunity as a defense to a defamation claim, see Kotlikoff v. Community News, 89 N.J. 62, 69, 444 A.2d 1086, 1089 (1982). Regardless of whether or not everything that Kavanaugh said and all of the communications she engaged in with respect to this matter fall within the realm of pure opinion, we need not reach this contention as it is not strictly speaking an immunity at all. As such, there is no need to and we do not address this separate potential defense.
For all of the foregoing reasons, the defendants' motion for summary motion is granted.