891 A.2d 705

**Teddy PETERS, Appellant**

**v.**

**Daniel COSTELLO and Maryann Costello, Appellees.**

Supreme Court of Pennsylvania.

Submitted July 27, 2004.

Decided Dec. 30, 2005.

104

Arthur Brian Jarrett, Philadelphia, for Teddy Peters, appellant.

Carol Krawitz Verlin, for Daniel and Maryann Costello, appellees.

Anthony Robert Giannone, Philadelphia, for Francesca Szypula.

BEFORE: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice CASTILLE.

This Court is called upon in this appeal to determine whether "non-biological grandparents" who stand *in loco parentis* to one of the parents of a child with respect to whom they seek grandparental visitation rights, and who otherwise qualify to seek partial custody/visitation, have standing to seek visitation under the Grandparent Visitation Act, 23 Pa.C.S. §§ 5311–13 (the "Act"). Both the trial court and the Superior Court held that appellees, the putative grandparents in this case, were entitled to pursue visitation under the Act as a result of their *in loco parentis* relationship to the mother of the child. For the reasons that follow, this Court agrees that appellees had standing, and therefore, we affirm.

The pertinent facts are undisputed: Francesca Szypula is the mother of Felicity Szypula, the child at issue. In 1979, shortly after Francesca was born, appellee Maryann Costello began babysitting her. When Francesca was eleven months old, her biological mother died and her biological father, Francis Szypula, left her in the custody of appellees. Appellees are not related by blood or by marriage to Francesca. Francesca lived with appellees continuously from eleven

months of age until age thirteen when she lived with her father for a period of eight months. At the conclusion of that eight-month period, Francesca returned to appellees, and appellees and Francesca's father entered into the following custody agreement:

WHEREAS, Plaintiff Francis J. Szypula ("Father") is the father of the minor child Francesca Marie Szypula born February 15, 1979;

WHEREAS, the biological mother of the child, Felicia Kay Forbes, died on January 30, 1980 when the child was less than one year old;

WHEREAS, Defendant[s] Daniel and Maryann Costello (Mr. And Mrs. Costello) have cared for the child [since] shortly after she was born;

WHEREAS, for a brief period the child lived with Father but has since returned to live with Daniel and Maryann Costello;

WHEREAS, Father and Mr. and Mrs. Costello desire to set forth the terms of the agreement with respect to the custody and support of the child while the child is living with the Costellos;

NOW THEREFORE, it is hereby stipulated and agreed by the above-captioned parties as follows:

1. Daniel and Maryann Costello shall have legal and physical custody of Francesca Marie Szypula and shall be responsible for protecting the child's best interests and welfare.

2. Father shall have the right to visit and communicate with the child on such occasions and with such frequency as he and the child may mutually agree.

3. Father shall assign to the Costellos the child's social security checks to be used for the support of the child, and shall continue to provide health insurance coverage for the child so long as it is available to him at a reasonable cost through his employment.

4. The Costellos shall be responsible for the child's health, education and welfare, and shall take such steps as are necessary to ensure that the child's physical and emotional

needs are met and that she is properly supervised at all times.

Pursuant to this agreement, Francesca remained in the custody of appellees and continued to live with them well into adulthood, indeed at least through November of 2002, when the trial court rendered its decision in this case.

On November 8, 1997, while still residing with appellees and unmarried, Francesca gave birth to Felicity. Appellant Teddy Peters, who was twenty-three years of age at the time of Felicity's birth, is the child's biological father. Francesca and Felicity lived with appellees for the first four years of Felicity's life, while appellant lived elsewhere. In March of 1999, appellant petitioned for shared custody of Felicity, which the trial court granted. Then, in November of 2001, appellant petitioned for and was awarded primary physical custody, while Francesca had partial custody which was limited to weekly supervised visits. Appellant allowed appellees to see Felicity at Christmas in 2001, but denied them access to the child thereafter.

On March 13, 2002, as appellant and Francesca continued to dispute custody arrangements, appellees filed a petition for visitation with Felicity. That action was consolidated with the existing custody dispute. The trial court held a consolidated hearing on October 30, 2002, at which Francesca, Daniel Costello, Felicity's teachers, appellant, a clinical psychologist hired by appellant, and appellant's neighbor testified. Mr. Costello testified that, although Francesca is not his biological daughter, he and his wife raised her as their own since she was eleven months old, and he has had a lifelong father-daughter relationship with her. He further testified that Felicity lived with appellees for a period of four years from the time of her birth until November 2, 2001, when appellant was granted primary physical custody. Mr. Costello testified that Felicity called him "Poppy" and called Mrs. Costello "Ma-mom;" that appellees had always regarded Felicity as their own grandchild; and that they had had a continuous and close relationship with Felicity and spent much time with her, including birthdays and holidays. Further, during the years

when Felicity lived with appellees, appellant neither questioned nor objected to their *de facto* grandparental relationship with the child. After primary physical custody was awarded to appellant, Mr. Costello attempted to see Felicity by calling appellant or stopping him on the street to ask for access, but appellant was unaccommodating.

Francesca testified that, since November of 2001, she had been allowed only supervised visitation with Felicity on Sundays at the Family Court facility in Philadelphia. She stated that Felicity was very attached to appellees, whom Francesca referred to as her parents. When Francesca had custody of Felicity, she resided with appellees, and Mrs. Costello cared for the child while Francesca was at work. Francesca stated that Mrs. Costello and Felicity enjoyed a loving relationship, with Mrs. Costello willing to do whatever she could for Felicity.

Dr. Najma Davis, a clinical social worker hired by appellant to perform a custody evaluation, also testified. Dr. Davis noted that she had visited appellees' home; she described appellees' relationship to Felicity as that of grandparents; stated that she considered appellees to be Felicity's grandparents; and testified that, in her professional opinion, appellees should continue to maintain a grandparental relationship with Felicity.

Appellant testified that appellees are not Felicity's biological grandparents, but acknowledged that he had treated them as Felicity's grandparents since she was born. Appellant also stated his view that a grandparent should not have a right to be involved with a grandchild if it would be detrimental to the child and, in his view, the care issues existing in the Costello home, issues which in part led to his successful custody petition, were such a detriment.

On November 13, 2002, the trial court heard Felicity's testimony *in camera*. Though understandably not very forthcoming given her age, Felicity did tell the court that she would like to live with her father, but also would like to spend time with appellees, whom she called "Poppy" and "Grandmom."

The trial court issued an order on November 15, 2002, awarding shared legal custody of Felicity to Francesca and appellant, with appellant having primary physical custody and Francesca having partial physical custody limited to the first and third weekend of every month, from Friday evening to Sunday evening. The court also granted appellees partial custody/visitation on the fourth weekend of every month from Friday evening to Sunday evening. In addition, the court apportioned a designated list of holidays among appellant, Francesca and appellees, and awarded appellees seven days of vacation-related physical custody, occurring at the conclusion of school each June. Finally, the court ordered that appellees should have liberal, unmonitored telephone access to Felicity.

Appellant appealed to the Superior Court, but only as to the partial custody/visitation award to appellees. Appellant argued that the trial court erred in finding that appellees had standing under the Grandparent Visitation Act, where appellees were neither the biological nor the adoptive grandparents of Felicity. The trial court filed an opinion in which it noted that it had found that appellees stood *in loco parentis* to Francesca because they assumed parental status when they entered into the custody agreement with Francesca's biological father and actually discharged parental duties for nearly all of Francesca's life. The court further noted that the rights and duties springing from a relationship *in loco parentis* are the same as in a biological parent-child relationship. With respect to appellant's argument that appellees cannot be considered Felicity's grandparents because they are not her biological grandparents, the trial court noted that nothing in the Act, or in the common meaning of the term "grandparent," restricted grandparental status to those with a biological relationship to the child. Therefore, the court determined that, as a result of their *in loco parentis* relationship with Francesca, appellees were Felicity's maternal grandparents.

Having found that appellees qualified as grandparents under the Act, the court next held that appellees had standing to petition for partial custody and visitation in the circumstances of this case. Section 5313 of the Act addresses "when grand-

parents may petition" for custody and/or visitation. Subsection (a) provides that grandparents may petition for partial custody and visitation, and authorizes the court to grant such relief, in the following circumstances:

### § 5313. When grandparents may petition.

**(a) Partial custody and visitation.**—If an unmarried child has resided with his grandparents or great-grandparents for a period of 12 months or more and is subsequently removed from the home by his parents, the grandparents or great-grandparents may petition the court for an order granting them reasonable partial custody or visitation rights, or both, to the child. The court shall grant the petition if it finds that visitation rights would be in the best interest of the child and would not interfere with the parent-child relationship.

23 Pa.C.S. § 5313(a). The court held that appellees had a right to petition because Felicity had lived with them for four years until removed from their home by appellant, thereby meeting the requirements of the act.

With respect to the merits of the petition, the court noted that it had found that allowing appellees partial custody and visitation was in the child's best interest. The best interest finding was based upon the evidence revealing that Felicity had a close relationship with appellees; that the child herself expressed a desire to see appellees; and that appellant's own expert opined than this grandparental relationship should be maintained. Finally, the court noted that there was no evidence that the custody schedule it had ordered would interfere with either parent's relationship with the child.

The Superior Court affirmed in an unpublished opinion. The panel noted, as the trial court had, that *in loco parentis* status embodies an assumption of parental status as well as an actual discharge of parental duties, and gives rise to a relation which is " 'exactly the same as between parent and child.' " Slip op. at 3 (citation omitted). The panel found that appellant had proffered no reason why, when someone assumes parental status with respect to a child, "that status and the standing it

confers *vis a vis* a grandchild must be disregarded" especially where, as here, those seeking access to the child "are regarded by all those concerned as operative grandparents." *Id.* at 4. Finally, the panel rejected appellant's argument that the Act applies only to biological grandparents, agreeing with the trial court that the statute contains no such restriction. *Id.* at 5.

For purposes of this appeal, appellant does not dispute the trial court's findings that appellees stand *in loco parentis* to Francesca; that they served as *de facto* grandparents to Felicity; and that maintaining that relationship would be in the child's best interest. Instead, appellant confines himself to the preliminary and strictly legal question of appellees' standing to seek visitation and/or partial custody under the Grandparent Visitation Act. Appellant contends here, as he did below, that the Act does not confer standing upon putative grandparents who are neither the adoptive nor the biological grandparents of the child in question. The narrow issue presented is primarily a question of statutory interpretation, and as such, this Court's review is plenary. *See Commonwealth v. Gilmour Manufacturing Co.,* 573 Pa. 143, 822 A.2d 676, 679 (2003); *C.B. ex rel. R.R.M. v. Commonwealth, Department of Public Welfare,* 567 Pa. 141, 786 A.2d 176, 180 (2001). *See also R.M. v. Baxter ex rel. T.M.,* 565 Pa. 619, 777 A.2d 446 (2001) ("the issue of whether the statute confers standing upon a grandparent to seek custody and/or visitation is purely one of law, over which our review is plenary."). Although this Court's review is hampered to some extent by the fact that appellees have not filed a brief, we nevertheless have little difficulty in concluding that affirmance is required.

 Since the basis for appellees' claim of grandparental visitation rights derives from their *in loco parentis* relationship with Francesca, we will begin by examining the common law *in loco parentis* doctrine. The term *in loco parentis* literally means "in the place of a parent." *Black's Law Dictionary* (7th Ed. 1991), 791.

The phrase *"in loco parentis"* refers to a person who puts oneself [sic] in the situation of a lawful parent by assuming

the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of *in loco parentis* embodies two ideas; first, the assumption of a parental status, and, second, the discharge of parental duties. The rights and liabilities arising out of an *in loco parentis* relationship are, as the words imply, exactly the same as between parent and child.

*T.B. v. L.R.M.*, 567 Pa. 222, 786 A.2d 913, 916–17 (2001) (citations omitted).[1] *Accord Commonwealth v. Gerstner*, 540 Pa. 116, 656 A.2d 108, 112 (1995). In *T.B.*, a case which has not been cited by appellant or the courts below, this Court summarized the broad principles governing third party standing in custody/visitation cases, including common law *in loco parentis* standing, as follows:

> It is well-established that there is a stringent test for standing in third-party suits [fn6] for visitation or partial custody due to the respect for the traditionally strong right of parents to raise their children as they see fit. *R.M. v. Baxter ex. rel. T.M.*, 565 Pa. 619, 777 A.2d 446, 450 (2001). The courts generally find standing in third-party visitation and custody cases only where the legislature specifically authorizes the cause of action. *Id.* A third party has been permitted to maintain an action for custody, however, where that party stands *in loco parentis* to the child. *Gradwell v. Strausser*, 610 A.2d at 1002.

> [FN6.] Persons other than biological parents are "third parties" for purposes of custody disputes. *Gradwell v. Strausser*, 416 Pa.Super. 118, 610 A.2d 999, 1001 (1992).

786 A.2d at 916.

The appellant in *T.B.* was the biological mother of the child at issue, who challenged the lower courts' finding that her lesbian former partner, with whom she was living when they decided to have the child together (through the agency of a sperm donor), stood *in loco parentis* to the child, and there-

1. The *T.B.* Court further noted that, although the *in loco parentis* doctrine had roots in cases concerning entitlement to and compensation for children's services, life insurance, and workers' compensation, "[i]n recent years, ... the doctrine has been used almost exclusively in matters of child custody." *Id.* at 916 (citations omitted).

fore, had standing to seek visitation. This Court rejected the mother's argument that the *in loco parentis* doctrine should be abandoned entirely in this instance noting, among other things, that the mother had forwarded no persuasive reason to reject a well-established common law doctrine and effect a change in the law "that could potentially affect the rights of stepparents, aunts, uncles or other family members who have raised children, but lack statutory protection of their interest in the child's visitation or custody." *Id.* at 917. In this regard, *T.B.* also quoted with approval the Superior Court, which described the importance of the doctrine in custody/visitation matters, as follows:

> "The *in loco parentis* basis for standing recognizes that the need to guard the family from intrusions by third parties and to protect the rights of the natural parent must be tempered by the paramount need to protect the child's best interest. Thus, while it is presumed that a child's best interest is served by maintaining the family's privacy and autonomy, that presumption must give way where the child has established strong psychological bonds with a person who, although not a biological parent, has lived with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent. Where such a relationship is shown, our courts recognize that the child's best interest requires that the third party be granted standing so as to have the opportunity to litigate fully the issue of whether that relationship should be maintained even over a natural parent's objections."

*Id.* at 917, *quoting J.A.L. v. E.P.H.,* 453 Pa.Super. 78, 682 A.2d 1314, 1319–20 (1996).

The *T.B.* Court likewise rejected the mother's claim that the appellee lacked standing based on the assertion that the statutory custody scheme does not encompass former partners or paramours of biological parents. We noted that appellee's standing claim was premised upon the common law doctrine of *in loco parentis,* and "[t]he mere fact that the statute does not reference the doctrine cannot act to repeal by implication what has been entrenched in our common law." *Id.* at 917–18.

Finally, we concluded that the appellee indeed satisfied the requirements for *in loco parentis* status, and therefore, had standing to petition for partial custody for purposes of visitation.[2]

This case, of course, differs from *T.B.* in that it involves grandparental standing to petition for partial custody/visitation, and the General Assembly has specifically spoken to the circumstances under which a grandparent may so petition in the Grandparent Visitation Act. The common law doctrine of *in loco parentis* nevertheless is a central concern, since that is the basis for appellees' claim to grandparental status.

Appellant argues that the Act establishes a narrow and limited exception to the general rule that parents have a fundamental right to rear their children free from third party or governmental intrusion, and standing to seek to interfere with that right must be limited to those individuals specified by the statute. Appellant notes that the term "grandparent" is not defined in the Act, and therefore, it should be accorded its plain and ordinary meaning which, in appellant's view, would be narrowly limited to a child's biological or adoptive grandparents. Because appellees are not Felicity's biological or adoptive grandparents, appellant argues that they are third parties who lacked standing to petition for visitation under the Act. Moreover, appellant argues that recognizing standing in the situation of appellees here will turn the narrow grandparent exception into a broad one whereby any person who stood *in loco parentis* to a parent during that parent's childhood could later seek visitation with that parent's children, which

**2.** Mr. Justice Saylor's dissent in *T.B.*, which this author joined, disagreed with the *T.B.* Majority's dismissing the significance of the legislative scheme, as well as the conclusion that the appellee in fact stood *in loco parentis* to the child. With respect to the latter point, the dissent opined that the doctrine of *in loco parentis* encompasses more than practical or emotional parenthood, but also requires legal incidents of parenthood; since the appellee had no legally recognized familial relationship with the child, the dissent concluded that she lacked standing. *Id.* at 922 (Saylor, J., joined by Castille, J., dissenting). It is worth noting that, since Francesca's biological father entered into a custody agreement with appellees conferring on them all legal and custodial rights vis-à-vis Francesca, appellees stood *in loco parentis* to Francesca under either test set forth in *T.B.*

possibly could lead to disputes between "[a]ctual legitimate grandparents" and previous parental caretakers claiming to be "better" grandparents. In appellant's view, appellees here are third parties, pure and simple, and should have faced the hurdles that would face any third party seeking custody as against the child's parents, without being able to resort to the easier method of access afforded only to biological or adoptive grandparents via the Act.

The object of interpretation and construction of all statutes is to ascertain and effectuate the intention of the General Assembly. *See* 1 Pa.C.S. § 1921(a); *In re Canvass of Absentee Ballots of November 4, 2003 General Election,* 577 Pa. 231, 843 A.2d 1223, 1230 (2004). When the words of a statute are clear and free from all ambiguity, their plain language is generally the best indication of legislative intent. *Bowser v. Blom,* 569 Pa. 609, 807 A.2d 830, 835 (2002); *Pennsylvania Financial Responsibility Assigned Claims Plan v. English,* 541 Pa. 424, 664 A.2d 84, 87 (1995); 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."). In construing statutory language, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage...." 1 Pa.C.S. § 1903(a). It is only when "the words of the statute are not explicit" on the point at issue that resort to statutory construction is appropriate. 1 Pa.C.S. § 1921(c); *see also Comm. v. Packer,* 568 Pa. 481, 798 A.2d 192, 196 (2002).

Section 5301 of the Domestic Relations Act states a legislative policy respecting grandparental contact with grandchildren: "The General Assembly declares that it is the public policy of this Commonwealth, when in the best interest of the child, to assure a reasonable and continuing contact of the child with both parents after a separation or dissolution of the marriage and the sharing of the rights and responsibilities of child rearing by both parents and a continuing contact of the child or children with grandparents when a parent is deceased, divorced or separated." 23 Pa.C.S. § 5301. Section 5313(a)

addresses when grandparents may petition for visitation and/or partial custody of grandchildren. Mere grandparental status alone does not entitle a person to standing under the Section: instead, the child must have actually resided with the putative grandparent for 12 months or more and must have been removed from the home by his parent. Even if standing to petition is so established, an actual award of visitation rights to the grandparent would be proper only if it is determined that the award is in the child's best interests and does not interfere with the parent-child relationship.

■ On the specific point at issue, however, we note that the statute does not define the term "grandparent." Notably, the term is not qualified by speaking of biological grandparents, or of biological and adoptive grandparents, or of biological and adoptive grandparents to the exclusion of others who may claim grandparental status, such as those with an *in loco parentis* relationship with one of the parents of the child. Instead, it simply speaks of grandparents (and great-grandparents). In construing the term, this Court must look to the "common and approved usage" of the term "grandparent." 1 Pa.C.S. § 1903(a). Webster's Third New International Dictionary defines "grandparent" as "a parent's parent." *Webster's Third New International Dictionary* (2002), 988. The same dictionary defines "parent" as follows: "1a: one that begets or brings forth offspring: Father, Mother; b[law] (1): a lawful parent **(2): a person standing in loco parentis although not a natural parent....**" *Id.* at 1641 (emphasis supplied). *See also The Merriam Webster Dictionary* (1997), 535 (defining "parent" as "1: one that begets or brings forth offspring: FATHER, MOTHER[;] 2: **one who brings up and cares for another**") (emphasis supplied). Applying these common definitions of the terms grandparent and parent, because appellees stand *in loco parentis* to Francesca, they are the parents of Felicity's mother, and therefore, Felicity's grandparents.

The common and approved usage of the term "grandparent" and the result it compels also comports with the common law. As appellant concedes in equating adoptive grandparental status with biological grandparental status, there are instances

in the law where non-biological family status has the same legal effect as biological status. But, *in loco parentis* relationships, like adoptive relationships, have a settled place in the law as well, and generate equivalent parental rights and responsibilities. Consistently with the view of the Court Majority in *T.B.*, we will not read the General Assembly's failure to address the various permutations of parentage in Section 5313(a) as reflecting an intention to eliminate grandparental relationships that have their roots in the common law doctrine. 786 A.2d at 918 (General Assembly's failure to address common law *in loco parentis* doctrine in provisions respecting custody cannot "act to repeal by implication what has been entrenched in our common law.").

Turning to the effect of the doctrine in this case, it is undisputed that appellees stand *in loco parentis* to Francesca, because they assumed the status of Francesca's parents and discharged their parental duties to her, all within the context of a tangible legal relationship created by Francesca's biological father when he entered into a custody agreement with appellees. As we have noted above, it is settled that "[t]he rights and liabilities arising out of an *in loco parentis* relationship are, as the words imply, **exactly the same as between parent and child.**" *Id.* at 917 (emphasis supplied). One of the natural incidents of parenthood is that parents become the grandparents of their children's children. And, indeed, it is notable that appellees here in fact assumed the status of *de facto* grandparents when Francesca gave birth to Felicity while still living at home, and filled that role for a substantial portion of the child's life, since they housed Francesca and Felicity for four years and cared for the child when Francesca worked. In light of the settled legal effect of *in loco parentis* status, it seems unlikely in the extreme that the General Assembly intended that persons with a legal relationship "exactly the same" as that of a parent to a child would be deemed to have no legally cognizable relationship with the offspring of that child.

We note that appellant's concerns with the potential effects of this conclusion, that is, opening the floodgates to petitions

from potentially innumerable caretakers with no biological or adoptive relationship to the *in loco parentis* child, is vastly overstated. Section 5313(a) standing is specifically limited to those grandparents seeking visitation with a grandchild who "has resided with his grandparents or great-grandparents for a period of 12 months or more and is subsequently removed from the home by his parents." Thus, it does not encompass every grandparent, much less every person who may seek to forward a claim for "*in loco*" grandparent status. Therefore, appellant's concern that affirmance of the decision below would permit any non-biological caretakers of a child's parent to file a petition for partial custody or visitation is baseless. This provision is narrowly drawn and clearly applies only to those grandparents who have resided with their unmarried grandchildren for a period of a year or more.[3]

On the other hand, to deny appellees the right even to seek visitation under the Act, simply because they lack a biological or formal adoptive connection to Francesca and Felicity, would artificially minimize appellees' actual and substantial relationship to Francesca and Felicity and their actual contributions to their well-being where appellees have, for more than two decades, assumed the responsibilities attendant upon parenting Francesca and serving as *de facto* grandparents to Felicity. Appellees are not officious intermeddlers or mere "prior caretakers," as appellant would have it. As a result of their willingness to step in and actually perform the roles of parents and grandparents, they have distinguished themselves from all other persons lacking a biological or adoptive relationship with this child. In this regard, appellant's argument that the fact

3. We are aware that *R.M. v. Baxter ex. rel. T.M.*, 565 Pa. 619, 777 A.2d 446 (2001), held that a grandparent has automatic standing, under subsection 5313(b), to petition for custody, while the language of subsection (a) specifically limits the ability of grandparents to petition for visitation to those circumstances in which "an unmarried child has resided with his grandparents or great-grandparents for a period of 12 months or more and is subsequently removed from the home by his parents." *Baxter* did not involve an *in loco parentis* issue. We neither address nor decide whether an individual who establishes *in loco parentis* status with regards to a parent of a child has automatic standing to seek grandparental custody under subsection (b); any such decision is better left to an appropriate case raising that specific claim.

that Felicity has a living, biological maternal grandparent justifies denying appellees' standing to seek visitation misses the point. Francesca had and has a living, biological parent, too; but it was appellees who took on the responsibilities for raising Francesca, and thereby acquiring the attendant rights of parenthood. The universe of potential petitioners under the Act, while larger than the biological pool, nevertheless is rationally restricted only to those who have played an actual rearing role in the child's life. Accordingly, we hold that, for purposes of the Act, appellees are the equivalent of the child's maternal grandparents, and as such, appellees had standing to file a petition seeking visitation with their grandchild.[4]

The decision of the Superior Court is affirmed.

Chief Justice CAPPY, and Justices NIGRO, NEWMAN and SAYLOR join the opinion.

Justice BAER files a concurring opinion.

Justice EAKIN files a dissenting opinion.

Justice BAER concurring.

I join the majority opinion, but write to ensure that such joinder is not misconstrued in the future. Initially, I believe this ruling is fact specific and will not be of general application. With the exception of eight months around her thirteenth year, Francesca has lived her entire life with the

4. In a subsection of his brief entitled "Policy," appellant cites the United States Supreme Court's decision in *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion), as support for his argument that a non-abusive custodial parent has a right to determine what, if any, contact the child should have with grandparents. According to appellant, the recognized liberty interest of parents must inform the decision here. We note that appellant does not allege that this statute is unconstitutional under *Troxel*. Instead, his claim is confined to the proper interpretation of the statute for standing purposes, and *Troxel* is invoked as weighing in favor of his restrictive interpretation. In any event, *Troxel* is inapposite, as that case involved a Washington statute giving **any person** the right to petition for visitation at any time and granting authority to the courts to permit such visitation. The U.S. Supreme Court found the statute overbroad, but it was not a narrow grandparent visitation statute such as the statute at issue here, and moreover, no majority viewpoint emerged.

Costellos. Francesca's mother is dead, and at the conclusion of the eight-month period during which Francesca lived with her father, her father signed a formal agreement entrusting the Costellos with responsibility for Francesca's health, education, welfare, and physical and emotional needs. The only thing missing in the agreement between Francesca's father and the Costellos that would have mooted this suit is formalized adoption. Moreover, Francesca's child Felicity, who is at the center of this dispute, lived her entire life with the Costellos until Appellant obtained primary custody of Felicity through a court action. This is simply not a case of the devoted nanny or next door neighbor from a parent's childhood seeking custody of the parent's child, but rather this holding applies only to those individuals who stand *in loco parentis* to the parent and have lived with the child for twelve months or more. Accordingly, while I join the majority opinion, I emphasize the compelling nature of the facts of this case which would have to be present in any case before this would be applicable as precedent.

Finally, the majority notes at footnote 3 the potential interaction of this opinion with our Court's decision in *R.M. v. Baxter ex. rel. T.M.*, 565 Pa. 619, 777 A.2d 446 (2001), which provides grandparents with automatic standing to petition pursuant to Section 5313(b) for full custody without limitation. For similar reasons to those stated above in relation to Section 5313(a), I am convinced that few will be able to satisfy the requirements for custody under Section 5313(b). Moreover, I must note that I believe that *Baxter* was wrongly decided and notwithstanding my deep respect for *stare decisis*, will urge its reversal when the opportunity arises.

Justice EAKIN dissenting.

My colleagues confer upon a couple, acting *in loco parentis* to a woman who is now well past the age of minority, standing to pursue court-ordered visitation of the woman's daughter under the Grandparent Visitation Act. I respectfully dissent.

The question is whether appellees are entitled to the preferred status, conferred only by the statute, enjoyed by grand-

parents of children; as the majority notes, the narrow question before this Court is one of interpretation of that statute.

The Act does not define "grandparents," it is true, but that word is hardly in need of definition. The term "grandparent" is clear and unambiguous, and it has been for the entirety of Pennsylvania jurisprudence. The traditional, common, clear, and time-honored definition of "grandparent" is the parent of one's parent. Webster's Third New International Dictionary Unabridged 988 (3d ed. 1993). That is achieved one of two ways: biologically, or through adoption. A grandparent does not include someone who acts as a grandparent. Behaving like a grandparent, filling the role of a grandparent, and having others think of you as a grandparent may give rise to familial inclusion and affectionate wishes at holidays and birthdays, but it simply does not make it so for purposes of standing in child custody disputes. Serving as surrogate grandparent does not give one the statutory status of the real thing.

> As a general rule, the best indication of legislative intent is the plain language of a statute. Courts may resort to other considerations to divine legislative intent only when the words of the statute are not explicit. Thus, this Court has consistently held that other interpretive rules of statutory construction are to be utilized only where the statute at issue is ambiguous.

*Pennsylvania School Boards Association v. Public School Employees' Retirement Board,* 580 Pa. 610, 863 A.2d 432, 436 (2004) (citations omitted). The Statutory Construction Act states, in relevant part, "[w]ords and phrases shall be construed according to rules of grammar and *according to their common and approved usage* . . . ." 1 Pa.C.S. § 1903(a) (emphasis added). "Only after the words of the statute are found to be unclear or ambiguous should a reviewing court further engage in an attempt to ascertain the intent of the Legislature through the use of the various tools provided in the Statutory Construction Act." *Zane v. Friends Hospital,* 575 Pa. 236, 836 A.2d 25, 31 (2003). "Grandparent" simply is not an ambiguous term. The lack of definition in the statute does not connote

ambiguity—it connotes the opposite: there is no need for definition because of the obvious, simple, and unconfused meaning of the word. Where a term is instantly recognizable and clear, the failure to define it in expansive terms hardly signifies the intent to include the non-traditional meaning—if anything, the absence of expansive definitional language means that expansive meaning is not intended.

The majority, however, adopts an expansive meaning of the term "grandparent" under the guise of following its common and approved usage. The majority defines grandparent as " 'a parent's parent.' " Majority Op., 586 Pa. at 115, 891 A.2d at 713 (quoting Webster's Third New International Dictionary 988 (2002)). The majority adopts a definition of "parent" which includes: " 'a person standing *in loco parentis* although not a natural parent....' " *Id.* (quoting Webster's Third New International Dictionary 1641 (2002)) (emphasis added). Thus, the majority concludes appellees, acting *in loco parentis* to an adult woman, are grandparents of the woman's daughter. *Id.,* at 115, 891 A.2d at 712 – 13.

Pennsylvania courts recognize a person may "put[ ] himself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of legal adoption. This status of *'in loco parentis'*, embodies two ideas; first, the assumption of a parental status, and second, the discharge of parental duties." *Commonwealth ex rel. Morgan v. Smith,* 429 Pa. 561, 241 A.2d 531, 533 (1968) (emphasis added); *see also* Black's Law Dictionary 803 (8th ed. 2004) (*in loco parentis* is defined as "[o]f, relating to, or acting as a temporary guardian or caretaker of a child, taking on all or some of the responsibilities of a parent.")

There is no evidence the genesis and evolution of the *in loco parentis* concept contemplated or intended granting a person who stands *in loco parentis* to an individual the corresponding status of *"in loco grandparentis"* over the individual's children. Consequently, the common and approved usage of the term "grandparent" does not include a person who stands *in loco parentis* to the natural parent of a child.

Further, the majority refers to a definition of "parent" which includes " 'one who brings up and cares for another[.]' " Majority Op., 586 Pa. at 115, 891 A.2d at 713 (quoting The Merriam Webster Dictionary 535 (1997)). The adoption of this expansive definition is more troubling for its potential consequences concerning parent-child relationships than grandparent-child relationships. Childcare by non-parental parties is not unusual. Where both parents must work outside the home, others commonly assist in the raising of children. Under the majority's definition of "parent," babysitters, day-care workers, nannies, and possibly some teachers and nurses (to name a few) could arguably be considered a child's "parent" (and consequently a grandparent of that child's children) since they help bring up and care for the child. Applying this definition of "parent" leads to an absurd and unreasonable result. *See* 1 Pa.C.S. § 1922(1) (presumption General Assembly does not intend absurd or unreasonable result); *Commonwealth v. Burnsworth*, 543 Pa. 18, 669 A.2d 883, 888 (1995) (citing 1 Pa.C.S. § 1922(1)).

Next, the majority's expansive definition of "parent" and "grandparent" opens the door for Pennsylvania law to conflict with *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). In *Troxel*, the United States Supreme Court struck down a Washington grandparent visitation statute because it was too broad, allowing "any person" to have standing for visitation. The right to parent is a fundamental right that deserves the most protection afforded to individuals. *Id.*, at 65, 120 S.Ct. 2054. Although *Troxel* is not specifically implicated in this matter because this Court is only deciding if appellees have standing under the Grandparent Visitation Act to seek court-ordered visitation, the majority opens the door to a future *Troxel* challenge if a third party can find a claim of either *in loco grandparentis* status with the right to intervene in a parent's fundamental right to make decisions on a child's behalf, or the majority's newly recognized "caregiver parent" status.

Numerous Pennsylvania statutes refer to grandparents; none find any need to define the term to include "persons who

act like grandparents." *See* Uniform Athlete Agents Act, 5 Pa.C.S. § 3101 *et seq.*; Pennsylvania Uniform Transfers to Minors Act, 20 Pa.C.S. § 5301 *et seq.*; Agriculture Education Loan Forgiveness Act, 24 P.S. § 5198.1 *et seq.*; Pennsylvania Adult and Family Literacy Education Act, *id.,* § 6401 *et seq.*; Vital Statistics Law of 1953, 35 P.S. § 450.105; Older Adult Daily Living Centers Licensing Act, 62 P.S. § 1511.2; Pooled Trust Act, *id.,* § 1965.2; Family Caregiver Support Act, *id.,* § 3063; Family Support for Persons with Disabilities Act, *id.,* § 3303; Tax Reform Code of 1971, Realty Transfer Tax, 72 P.S. § 8101–C. Are we to reinterpret the term "grandparent" in each of these statutes as well?

In addition to biological and adoptive grandparents, Pennsylvania case law acknowledges legal grandparents, *In re McAllister,* 31 Pa. D. & C. 4, 8 (Quar.Sess.Lancaster Cty.1937) (legal grandparent of illegitimate child liable for support), step-grandparents, *Hill v. Divecchio,* 425 Pa.Super. 355, 625 A.2d 642, 647–48 (1993) (biological grandmother has standing to sue for custody; step-grandfather does not), and foster grandparents. *Wolf v. Workers' Compensation Appeal Board,* 705 A.2d 483, 486 (Pa.Cmwlth.1997) (foster grandparent providing volunteer services to special children not statutory employee of county). Pennsylvania has never, however, recognized the concept of *de facto* grandparents for purposes of custody and visitation.

Eleven states define "grandparent" as the biological or adoptive parent of a minor child's biological or adoptive parent; none includes *"in loco grandparentis."* *See generally* Del.Code Ann. tit. 10, § 901(9)(m)(n) (relationships include blood relationships and relationships by adoption); Haw.Rev. Stat. § 386–2 (grandparent is parent of parent by adoption, but not parent of stepparent, stepparent of parent, or stepparent of stepparent); 405 Ill. Comp. Stat. 80/2–3(h) (grandparent is relative created through relationship by blood, marriage, or adoption); *see also id.,* 80/2–3(g) ("parent" means biological or adoptive parent of mentally disabled adult, or licensed as foster parent); Iowa Code § 239B.1(12)(2005) (grandparent is specified relative created through blood relationship, mar-

riage, or adoption or spouse to one of relatives); Me.Rev.Stat. Ann. tit. 19–A, § 1802 (grandparent is biological or adoptive parent of child's biological or adoptive parent); Mich. Comp. Laws § 722.22(d) (grandparent is natural or adoptive parent of child's natural or adoptive parent); Neb.Rev.Stat. § 43–1801 (grandparent is biological or adoptive parent of minor child's biological or adoptive parent); N.M. Stat. Ann. § 40–9–1.1(A), (B) (grandparent is biological or adoptive parent of minor child's biological or adoptive parent); Ohio Rev.Code Ann. § 5101.85(A) (kinship caregiver includes grandparents related by blood or adoption to child); Utah Code Ann. § 30–5–1 (grandparent is person whose child, by blood, marriage, or adoption, is the parent of another); W.Va.Code § 48–10–203 (grandparent is biological relationship, person married or previously married to biological grandparent). Each of the other 38 states has a grandparent visitation statute [1] and related

1. Ala.Code § 30–3–4.1's rebuttable presumption in favor of grandparental visitation held unconstitutional, *see R.S.C. v. J.B.C.*, 812 So.2d 361, 371 (Ala.Civ.App.2001); Alaska Stat. § 25.20.065; Ariz.Rev.Stat. Ann. § 25–409; Ark.Code Ann. § 9–13–103's prior version held unconstitutional, *see Seagrave v. Price*, 349 Ark. 433, 79 S.W.3d 339, 344–45 (2002) (trial court constitutionally erred by shifting grandparent's burden to fit parent); Cal. Fam.Code § 3104; Colo.Rev.Stat. § 19–1–117; Conn. Gen.Stat. § 46b–59 held unconstitutional as applied, *see Roth v. Weston*, 259 Conn. 202, 789 A.2d 431, 449 (2002) (heightened burden of proof to justify infringement on parent's fundamental right to parent not met); Fla. Stat. § 752.01 held per se unconstitutional, see *Belair v. Drew*, 776 So.2d 1105, 1107 (Fla.App. 5 Dist.2001) (Section 752.01 is facially unconstitutional as it impermissibly infringes on privacy rights under Florida Constitution); Ga.Code Ann. § 19–7–3's prior version held unconstitutional, *see Ormond v. Ormond*, 274 Ga.App. 869, 619 S.E.2d 370, 371 (2005) (state may only impose grandparent visitation "over the parents' objections" on showing that failing to do so would be harmful to child); Idaho Code § 32–719; Ind.Code § 31–17–5–1; Kan. Stat. Ann. § 38–129 held unconstitutional as applied, *see Dep't of Social and Rehabilitation Services v. Paillet*, 270 Kan. 646, 16 P.3d 962, 970 (2001) (trial court must presume fit parent will act in best interests of his or her child); Ky.Rev.Stat. Ann. § 405.021; La.Rev.Stat. Ann. § 9:344; La. Civ.Code Ann., art. 136; Md.Code Ann., Fam. Law § 9–102 held unconstitutional as applied, see *Brice v. Brice*, 133 Md.App. 302, 754 A.2d 1132, 1135 (2000) (fit parent is entitled to presumption that he acts in best interest of his or her child); Mass. Gen. Laws ch. 119, § 39D; Minn.Stat. § 257C.08; Miss.Code Ann. § 93–16–3; Mo. Rev.Stat. § 452.402; Mont.Code Ann. § 40–9–102; Nev.Rev.Stat. § 125C.050; N.H.Rev.Stat. Ann. § 458:17–d repealed; N.J. Stat. Ann. § 9:2–7.1 held unconstitutional as applied, *see Wilde v. Wilde*, 341

statutes. No state defines "grandparent" as a person standing *in loco parentis* to an individual who is a parent. An extensive review of case law from these states reveals, to my knowledge, no reported decision interpreting "grandparent" to include a person standing *in loco parentis* to a parent.[2] This apparently leaves the majority as the only court rendering a published decision interpreting "grandparent" to include a person standing *in loco parentis* to a parent.

The General Assembly is familiar with the concept of the *in loco parentis* relationship, and would have included it, had that been its intent. In explaining who qualifies for death benefits, for example, the Workers' Compensation Act states, "[i]f [children are] members of decedent's household at the time of his death, the terms 'child' and 'children' shall include stepchildren, adopted children and children to whom he stood *in loco parentis*, and children of the deceased and shall include posthumous children." 77 P.S. § 562 (emphasis added). The General Assembly could have similarly included the *in loco parentis* relationship in the Grandparent Visitation Act but chose not to; we may not write it into the Act for it.

N.J.Super. 381, 775 A.2d 535, 545 (A.D.2001) (grandparent's statutory right to hale parent to court must be carefully circumscribed, especially where parent is fit); N.Y. Dom. Rel. Law § 72; N.C. Gen.Stat. §§ 50–13.2, 50–13.2A; N.D. Cent.Code § 14–09–05.1; Okla. Stat. tit. 10, § 5 held unconstitutional as applied, see *Ingram v. Knippers*, 72 P.3d 17, 21 (Okla.2003) (grant of grandparental visitation under Section Five is voidable); Or.Rev.Stat. § 109.332; R.I. Gen. Laws §§ 15–5–24 to 15–5–24.3; S.C.Code Ann. § 20–7–420(33) held unconstitutional as applied, see *Camburn v. Smith*, 355 S.C. 574, 586 S.E.2d 565, 567 (2003) (court must allow presumption that fit parent's decision is in child's best interest); S.D. Codified Laws § 25–4–52's prior version held partially per se unconstitutional, see *Currey v. Currey*, 650 N.W.2d 273, 277 (S.D.2002) (presumption in favor of grandparents is unconstitutional); Tenn.Code Ann. §§ 36-6–306, 36–6–307; Tex. Fam.Code Ann. § 153.433; Utah Code Ann. § 30–5–2; Vt. Stat. Ann. tit. 15, §§ 1011–1013; Va.Code Ann. § 20–124.2; Wis. Stat. § 767.245 limited on constitutional grounds, *see In re Paternity of Roger*, 250 Wis.2d 747, 641 N.W.2d 440, 445 (Ct.App.2002) (courts must apply presumption that fit parent's decision regarding grandparental visitation is in best interest of child); Wis. Stat. § 880.155; Wyo. Stat. Ann. § 20–7–101.

2. New York state courts interpret "grandparent" to mean the biological or adoptive parent of a parent. *Gross v. Siegman*, 226 A.D.2d 724, 642 N.Y.S.2d 44 (N.Y.App.Div.1996); *Hantman v. Heller*, 213 A.D.2d 637, 624 N.Y.S.2d 64 (1995).

Appellees' relationship with mother is said to give them standing as *de facto* grandparents; this determination is flawed. That mother considers appellees to be her parents is a laudable testament to the role they have played in her life. But however mother views them, appellees stood in place of her parents—they are not her parents. There are limitations to the breadth of the *in loco parentis* relationship, and appellees cannot stand *"in loco grandparentis"* to the child since no such relationship exists.

Although our case law has not previously expressed that an *in loco parentis* relationship expires at age of majority, this appears to be the general rule unless the child is incapacitated. *See Babb v. Matlock,* 340 Ark. 263, 9 S.W.3d 508, 510 (2000) (*in loco parentis* status extinguishes at age of majority unless child is incapacitated); *Trievel v. Sabo,* 1996 WL 944981, unpublished opinion at 6 (Del.Super.1996) (child is emancipated from parent's control at age of majority; individual can no longer stand *in loco parentis*). This comports with the view that "[w]hen a child reaches the age of majority, a presumption arises that the duty to support the child ends...." *Sutliff v. Sutliff,* 339 Pa.Super. 523, 489 A.2d 764, 775 (1985) (citing *Verna v. Verna,* 288 Pa.Super. 511, 432 A.2d 630 (1981)). Here, when mother reached the age of majority, the need for an *in loco parentis* relationship ended.

The majority states *"in loco parentis* relationships, like adoptive relationships, have a settled place in the law as well, and generate equivalent parental rights and responsibilities." Majority Op., 586 Pa. at 116, 891 A.2d at 713. This is not entirely so. Perhaps most basic, unlike biological or adoptive parent-child relationships, *in loco parentis* status can be terminated at any time, by either party. *See* 59 Am.Jur.2d *Parent and Child* § 9 (citing *U.S. v. Floyd,* 81 F.3d 1517 (10th Cir.1996) (applying Oklahoma law); *Hamilton v. Foster,* 260 Neb. 887, 620 N.W.2d 103 (2000); *Chestnut v. Chestnut,* 247 S.C. 332, 147 S.E.2d 269 (1966); *Harmon v. Department of Social and Health Services,* 134 Wash.2d 523, 951 P.2d 770 (1998)).

Even if the rights incident to the exercise of *in loco parentis* status were equivalent to those of parents *as concerns the child,* Pennsylvania case law limits the breadth of rights and responsibilities of those acting *in loco parentis.* There is no basis in any statute or in this Court's jurisprudence to support the majority's extension of the *in loco parentis* relationship beyond the parent-child relationship. Should appellees die intestate, neither mother nor child will be recognized as an heir entitled to a share of their estate. 20 Pa.C.S. § 2103(1) (shares of intestate estate pass to, among others, issue of decedent; there is no provision for estate to pass to those with informal relationship). In *Bahl v. Lambert Farms, Inc.,* 572 Pa. 675, 819 A.2d 534 (2003), this Court determined that a man born out of wedlock, raised by his grandparents but held out to the world as their natural child (thus creating an *in loco parentis* relationship), was not entitled to inherit a share of his "parents'" estate. We stated:

[I]t is apparent that the General Assembly intended, as a general rule, to limit "issue" to those in the decedent's blood line and did not intend to include as first degree "issue" individuals without the requisite consanguinity *who had merely been treated like, or held out as, the decedent's children.*

*Id.,* at 538 (emphasis added). The Superior Court found a man was not responsible for support of his stepdaughter after the dissolution of the marriage, even though he stood *in loco parentis* before, during, *and after* the marriage to the girl's mother. *Commonwealth ex rel. McNutt v. McNutt,* 344 Pa.Super. 321, 496 A.2d 816 (1985). Although a biological or adoptive parent would not be excused from financial responsibility, the Superior Court explained that requiring a stepfather who stands *in loco parentis* to pay child support "would be carrying the common law concept of *in loco parentis* further than we are willing to go." *Id.,* at 817 (emphasis added).

The status of *"in loco grandparentis"* simply does not exist. Whatever relationship appellees had with the child's mother, they are not the grandparents of this child, who is in the

primary custody of the father. Appellees are not biological or adoptive parents of the child's parent—hence they are not grandparents within the meaning of the legislation of which they seek to take advantage.

Despite the majority's assertion to the contrary, allowing individuals to have standing as *de facto* grandparents will encourage litigation by third parties who assert standing for visitation and custody. As indicated, childcare by non-parental parties is not unusual, especially where both parents must work outside the home. Today, overseas military personnel must entrust care of their children to others during their service to our country. With this decision, we add to that burden by allowing such caregivers to seek custody simply by averring an appropriate *de facto* relationship, even though it was never the intent of the parents (much less the legislature) to create such a right. We open the door to a person who provides for a child, necessarily acting *in loco parentis* in this scenario, to have standing under an ill-defined *de facto* relationship.

"The courts generally find standing in third-party visitation and custody cases *only where the legislature specifically authorizes the cause of action.*" *T.B. v. L.R.M.*, 567 Pa. 222, 786 A.2d 913, 916 (2001) (citing *R.M. v. Baxter*, 565 Pa. 619, 777 A.2d 446, 450 (2001)) (emphasis added). The majority states "[§ ] 5313(a) standing is specifically limited to those *grandparents* seeking visitation with a grandchild who 'has resided with his grandparents or great-grandparents for a period of 12 months or more and is subsequently removed from the home by his parents.' " Majority Op., 586 Pa. at 116, 891 A.2d at 714 (emphasis added). This is true, but appellees are *not* grandparents; we should not strain common sense to define them as such simply because these people are good surrogate custodians.[3]

---

3. Even in this case, the situation is not so severe as to require this stretching of the word "grandparent" to include others. The child has four real grandparents—she is not deprived of grandparental relationships. As the child's mother apparently still lives with appellees, they will see the child regularly when mother has custody; thus, they will not be deprived of a relationship with her.

In *Larson v. Diveglia*, 549 Pa. 118, 700 A.2d 931 (1997), then Justice, now Chief Justice Cappy, writing for the majority, explained "[t]he creation of a doctrine of '*de facto*' standing to enable a person in possession of a minor child, in the absence of a formal custody order or agreement, to sue for support would only serve to further complicate this area of the law." *Id.*, at 933–34. Similarly, standing to sue for visitation or custody, based on a non-adoptive, non-biological relationship deemed to be grandparental, is equally ill-advised.

Adopting the concept of *in loco grandparentis* status is a slippery slope, and one on which we need not and should not tread. If the legislature wishes to grant standing to persons who act like grandparents, it may do so. It has chosen not to do so, and in my judgment, done so wisely. Thus, despite the appealing theory of my distinguished colleagues, I must dissent.