J-S05036-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| LINDA JO DYNE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TYLER JOHNSON | : | No. 813 WDA 2022 |

Appeal from the Order Entered June 14, 2022
In the Court of Common Pleas of McKean County Civil Division at No(s):
CP-42-CD-0000416-2021

BEFORE:  BENDER, P.J.E., LAZARUS, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:　　　　　**FILED: MARCH 27, 2023**

Linda Jo Dyne ("Grandmother") appeals from the order sustaining the preliminary objection filed by Tyler Johnson ("Father") and finding Grandmother lacked standing to seek custody of Z.K. ("Child"). We affirm.

In July 2021, Grandmother filed a Complaint for Custody, which the court dismissed without prejudice for failure to allege sufficient facts to establish standing. In December 2021, Grandmother filed an Amended Complaint for Custody alleging she had standing to seek custody under 23 Pa.C.S.A. § 5324(2) or (3), that is, because she stood *in loco parentis* to Child or because she satisfied the statutory requirements to establish standing as a grandparent. Father filed an objection to Grandmother's standing.

The court held a two-day hearing, and summarized the testimony as follows:

Mother became pregnant and gave birth to Child while still in high school. Mother and Grandmother both testified that Father was not present for Child's birth. However, they also both testified that Mother had gotten a temporary Protection From Abuse Order ("PFA") which prevented Father from being in contact with Mother. Grandmother also testified that Father, despite the temporary PFA, tried to go to the hospital and "force his way" in but ultimately was unable to do so and was not present for the birth. Father likewise testified he was not present for Child's birth due to the temporary PFA.

[1] The final PFA Order was not entered and the temporary Order was allowed to expire on or about December 3, 2013. *See Keirnan v. Johnson*, at McKean County docket no. 893 CD 2013.

Shortly after Child's birth . . . Grandmother took over most of her care, including providing financial assistance for Mother and Child, who resided with her. Grandmother testified that she and Mother reached an agreement whereby Grandmother would provide care for Child, including financial support and childcare services, if Mother would continue with her education and graduate from high school. That arrangement did not include Father. Grandmother testified that Mother would leave Child with her while going out with friends or socializing and was not a reliable parent to Child. Also, Mother would use Child as a pawn when she and Grandmother had a disagreement by taking Child away from Grandmother's home.

Grandmother testified that Father became involved in Child's life in either March or May of 2014. Father came to Grandmother's home, but she told him to leave; Grandmother testified that when she told Father to leave[,] he refused and assaulted her. Grandmother testified that was the only time she saw Father interact with Child, from her birth until age one. Mother's testimony was also that Father's interaction with Child was limited during that first year, but she testified that Father saw Child for probably a total of one or two months, with no period of custody lasting more than two weeks at most.

Father testified that his contact with Child was initially limited; he was unable to be present due to the temporary

PFA and also because of Mother's boyfriend at the time. However, he testified to several visits in December 2013 and testified that he and Mother got back together in December 2013 and from then until February 2014 he would visit Mother and Child frequently—three or four overnights each week—at Grandmother's house.

Mother moved out of Grandmother's home a few months after Child's birth and Child continued to reside with Grandmother. Between early 2014 and September 2016, testimony differed significantly on where Child was primarily residing. Each witness had variety of dates, and often were unclear on what events coincided with what dates. Grandmother testified that Child resided with her almost exclusively from October 2013 to February 2016, and that she visited Mother every other weekend. However, Mother testified that Child resided primarily with Grandmother until Mother moved to Warren, Pennsylvania, sometime in 2015. Then they shared custody equally on a weekly basis.

. . . Father testified that he would frequently stay at Grandmother's with Mother and Child until sometime around February 1, 2014. He testified that on or about that date he and Grandmother got into an argument regarding the suitability of Father's car. Father was driving a Mitsubishi Eclipse which Grandmother believed was unsuitable for Child to ride in. Father testified that Grandmother struck him in the face, causing Father, Mother, and Child to leave and go stay at Father's residence. Not long after, on or about February 10, 2014, Mother moved in with Father and remained there until June 2014 when she returned to Grandmother's residence. Father testified that he then moved to Wilcox, Pennsylvania, and between July 2014 and September 2014 Mother and Child would visit frequently, and spent three to four overnights at his home each week.

Next, Father testified that from September 22, 2014 to July 9, 2015 Mother and Child resided at his apartment in Wilcox. Mother then moved to Warren. Father testified that the move was a result of Mother finding a new boyfriend. In the summer of 2016, Mother and Child moved to Oklahoma. Mother testified that she moved to get away from Father, and that she chose Oklahoma because her boyfriend at the time had family there. It is undisputed that Mother took Child without Father's consent, and without telling anyone

she was moving. Grandmother only found out via a Facebook post. Seemingly, Father then had little to no contact with Child until March 2020. Grandmother, on the other hand, continued to make substantial efforts to see Child. She called her multiple times per week, sent her lots of packages, cards, gifts, and supplies, and visited Child in Oklahoma four of five times.

In October 2018, Child was removed From Mother's care and found by the court [i]n Oklahoma to be a deprived child—a finding comparable to dependency—due to serious concerns and allegations of abuse in Mother's home. Grandmother was granted permission to intervene in that case in December 2018. Ultimately, Mother's parental rights to Child were terminated and Child was placed in Foster care. Despite Grandmother's efforts, Child was not placed in her care. It appears, based on the Oklahoma court filings, that Grandmother's repeated efforts to see Child or have custody of her were thwarted by Child's foster parents and the agency in charge of her placement. At the time, Father was residing in South Carolina with his wife and her two sons. He was unaware of Child's placement in foster care because he had no contact with Mother. He heard via third parties that Child was in foster care and traveled to Oklahoma to take a paternity test so that Child could live with him. On March 30, 2020, Child moved to Father's home. In February 2021, Father moved to Kane, Pennsylvania. Since Father received custody of Child, neither Mother nor Grandmother has had contact with her, though Grandmother has made many efforts to do so, and has sent gifts and packages to Child which Father returns.

Trial Court Opinion, filed June 14, 2022, at 5-8 ("Standing Opinion").

The trial court found Grandmother lacked standing to seek custody and dismissed the Complaint. Grandmother filed a timely appeal. She raises the following issue: "Whether the trial court abused its discretion in dismissing the [Grandmother's] Amended Complaint for Custody, specifically, finding that the [Grandmother] lacked standing to sue for custody, pursuant to 23 Pa.C.S.A. Sections 5324(2) and (3)." Grandmother's Br. at 20.

"Determining standing in custody disputes is a threshold issue that must be resolved before proceeding to the merits of the underlying custody action." **C.G. v. J.H.**, 193 A.3d 891, 898 (Pa. 2018) (citing **K.C. v. L.A.**, 128 A.3d 774, 779 (Pa. 2015)). Issues of standing are questions of law and "our standard of review is *de novo* and our scope of review is plenary." **K.W. v. S.L.**, 157 A.3d 498, 504 (Pa.Super. 2017) (quoting **Rellick–Smith v. Rellick**, 147 A.3d 897, 901 (Pa.Super. 2016)).

"Generally, the Child Custody Act does not permit third parties to seek custody of a child contrary to the wishes of that child's parents." **Id.** There are exceptions to this rule, including for a third party who stands *in loco parentis* to the child and, under limited circumstances, the grandparent of a child:

> The following individuals may file an action under this chapter for any form of physical custody or legal custody:
>
> . . .
>
> (2) A person who stands in loco parentis to the child.
>
> (3) A grandparent of the child who is not in loco parentis to the child: (i) whose relationship with the child began either with the consent of a parent of the child or under a court order; (ii) who assumes or is willing to assume responsibility for the child; and (iii) when one of the following conditions is met:
>
> . . .
>
> > (B) the child is substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity . . . .

23 Pa.C.S.A. § 5324.

Grandmother first argues that she has standing because she stands *in loco parentis* to Child. She argues she established *in loco parentis* standing because the court found she assumed and discharged parental duties and she claims her assumption and discharge of duties was not in defiance of Child's parents wishes.

"The term *in loco parentis* literally means 'in the place of a parent.'" **K.W.**, 157 A.3d at 504-05 (quoting **Peters v. Costello**, 891 A.2d 705, 710 (Pa. 2005)). "A person stands *in loco parentis* with respect to a child when he or she 'assum[es] the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of *in loco parentis* embodies two ideas; first, the assumption of a parental status, and, second, the discharge of parental duties.'" **Id.** at 505 (citation omitted, alteration in **K.W.**). Further, "*in loco parentis* status cannot be achieved without the consent and knowledge of, and in disregard of[,] the wishes of a parent." **Id.** (quoting **E.W. v. T.S.**, 916 A.2d 1197, 1205 (Pa. 2007)) (alteration in **K.W.**).

Where the parties previously lived together as an "intact family unit" or where the plaintiff "assumed essentially all parenting responsibility," this Court has found *in loco parentis* standing. **D.G. v. D.B.**, 91 A.3d 706, 711 (Pa.Super. 2014); **see, e.g., McDonel v. Sohn**, 762 A.2d 1101, 1106 (Pa.Super. 2000) (finding aunt and uncle had *in loco parentis* standing where child spent significant extended periods of time with aunt and uncle, child's mother had executed a power of attorney granting *in loco parentis* power for the child to aunt and uncle before her death, and an expert witness testified

regarding the history of aunt and uncle's frequent, regular, and continuing involvement with the child); *T.B. v. L.R.M.*, 786 A.2d 913, 914-15, 919 (Pa. 2001) (finding appellee had *in loco parentis* standing where appellee and appellant were in an exclusive relationship, shared finances and expenses, decided to have a child, and shared day-to-day child rearing responsibilities, including taking child to medical appointments, and reasoning that *in loco parentis* standing existed as "[the a]ppellee lived with [the a]ppellant and [child] as a family unit and that [the a]ppellee assumed the role of co-parent"). In contrast, where the plaintiff's actions are more consistent with helping a family through a period of need, the Court has found *in loco parentis* standing did not exist. *See, e.g., D.G.*, 91 A.3d at 711-12 (finding the grandmother did not have *in loco parentis* standing where her actions were more consistent with assisting the mother and child in a time of need than with the informal adoption of the child); *Argenio v. Fenton*, 703 A.2d 1042, 1044 (Pa.Super. 1997) (finding the grandmother did not have *in loco parentis* standing where the mother and child lived with her for the first year of child's life and she cared for the child on a daily basis because the actions were appropriate where the mother was a young and trying to obtain an education and finding that the evidence did not establish the grandmother had informally adopted the child or that she intended to be bound by the legal duties and obligations of a parent).

In *D.G.*, this Court found a grandmother failed to establish she had *in loco parentis* standing. 91 A.3d at 712. There, the child and mother had

resided with the grandmother for "two periods in 2007 (May through August) and 2009 (February through September)," and "[d]uring the periods of combined residence, [the m]other and [child] slept in a camper and spent their days inside [the g]randmother's house." *Id.* at 710. The grandmother also provided financial assistance, did cooking and laundry for the mother and child, bathed the child, and cared for the child while the mother was away. *Id.* The court noted that "[e]ventually, . . . [the g]randmother wrote a letter seeking welfare assistance for [the m]other because she wanted [the m]other to move out." *Id.*

The trial court had found the grandmother in *D.G.* had *in loco parentis* standing. This Court reversed, reasoning that although the grandmother "played a large role in [the child's] life, providing occasional shelter, meals, laundry, and transportation to and from medical appointments," the mother and child had not lived at the grandmother's residence for four years and "[n]othing in the record indicates that the parties ever intended for [the m]other and [child] to reside permanently with [the g]randmother." *Id.* at 711. We concluded "[t]he periods of co-residence" and the help the grandmother provided in transporting the child to medical appointments were "more consistent with [the g]randmother assisting [the mother and child] in a time of need than with [the g]randmother's informal adoption of [the child]." *Id.* We concluded that the grandmother's efforts "are not consistent with an intent to assume all of the rights and responsibilities of parenthood." *Id.*

Here, the trial court found Grandmother established her relationship with Child and she assumed parental duties "immediately after [Child] was born." Standing Opinion at 9. The court, however, pointed out that Grandmother took responsibility for Child to ensure Mother graduated from high school, and "[t]here was no indication that either Mother or Grandmother intended for Grandmother to become Child's parent." *Id.* It noted Mother continued to live in the home and was supposed to parent Child while not in school. It pointed out that Mother used Child as a pawn to get her way and when Mother moved to Oklahoma, Mother did not execute any documentation to permit Grandmother any parental authority over Child. *Id.* at 9-10. The court added that Mother sometimes would argue with Grandmother about whether Grandmother was "overstepping when it came to Child." *Id.* at 10.

The court further pointed out that Father "took no affirmative action to permit Grandmother to become a parent to Child." *Id.* It noted that Father "was actively prevented from being in Child's life for the first few months" of Child's life, and "when he reentered the picture, he got into an argument with Grandmother regarding Child's care, and testified that when he was permitted to be with Child he performed parental duties on her behalf." *Id.* The court concluded that Child's parents "had no problem letting Grandmother provide care and financial assistance for Child," noting "Mother wanted to live her own life and was happy to see Child when it was convenient for her" and "Father took no steps to increase his custody time with Child, though his testimony suggests he had at least some regular contact prior to Mother's move to

Oklahoma." *Id.* However, the court stated it could "not find that either parent intended for Grandmother to usurp their roles as Child's parents, nor that either consented to that." *Id.* It therefore concluded Grandmother did not have *in loco parentis* standing.

This was not an abuse of discretion or error of law. The evidence supports the trial court's finding that Grandmother did not assume parental duties with parents' approval and consent. *See D.G.*, 91 A.3d at 710-12.

Grandmother next claims that if she does not have *in loco parentis* standing, the court erred in finding she did not have grandparent standing, as her relationship with Child began with the consent of Mother and she had assumed and/or was willing to assume responsibility for Child. She argues the court erred in finding Child was not at risk for parental abuse, neglect, drug or alcohol abuse, or incapacity. She points out Father was not at Child's birth due to a temporary PFA and claims that "other than short periods of time, [Father] was virtually non-existent as a parent until he was granted custody of [C]hild" in 2020. Grandmother's Br. at 33. She further notes that Father alienated Child from contact with Grandmother or Mother's family, which, she argues, "is tantamount to abuse and/or neglect." *Id.* at 38.

A grandparent who is not *in loco parentis* to the child may have standing to seek custody where the grandparent's relationship with the child began with the consent of a parent; the grandparent assumed or is willing to assume responsibility for the child; and one of three conditions is met, including that

- 10 -

the child is substantially at risk due parental abuse, neglect, drug or alcohol abuse, or incapacity:

> The following individuals may file an action under this chapter for any form of physical custody or legal custody: . . .
>
> (3) A grandparent of the child who is not in loco parentis to the child:
>
> (i) whose relationship with the child began either with the consent of a parent of the child or under a court order;
>
> (ii) who assumes or is willing to assume responsibility for the child; and
>
> (iii) when one of the following conditions is met:
>
> . . .
>
>> (B) the child is substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity. . . .

23 Pa.C.S.A. § 5324(3).

The court found Grandmother's relationship began with the consent of a parent, as she and Mother had an agreement she would provide care for Child, and Mother and Father allowed Child to reside with Grandmother. It further found Grandmother assumed and is willing to assume responsibility for Child, as she was a primary caregiver until 2016 and Grandmother attempted to remain in Child's life after Mother and Child moved to Oklahoma.

However, the court found Child was not at risk due to parental abuse, neglect, drug or alcohol abuse, or incapacity. The court pointed out that Child had resided with Father for two years and "there is no indication that she is at any risk with him." Standing Opinion at 11. The court noted that although

Grandmother and Mother had testified about Father's past abusive behavior, "neither [of them] presented evidence in support of that testimony," and Father had testified that Grandmother had been the one to strike him. *Id.* at 12. The court further pointed out that the incidents had happened, at the very latest, six years before the hearing and there was no evidence Father had ever been violent toward Child. *Id.*

The court did not abuse its discretion or err as a matter of law in finding Child was not substantially at risk due to parental abuse, neglect, drug or alcohol abuse, or incapacity. There is no evidence that Child is at risk of neglect or abuse in Father's custody or that Father has substance abuse issues or is in any way incapacitated.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/27/2023